**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | § CASE NO. 21-33218 |
| DALTON CRANE, L.C., | § |
|     DEBTOR. | § CHAPTER 11 |

**DECLARATION OF JOSHUA DALTON IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, JOSHUA DALTON, do hereby declare, under penalty of perjury, that:

1.     I am the Managing Member and sole member of Dalton Crane, L.C. ("Dalton Crane"), a Texas Limited Liability Company, with its principal place of business in Edna, Texas.

2.     As Managing Member of Dalton Crane I have detailed knowledge of and experience with the business and financial affairs of Dalton Crane, the debtor herein ("Debtor").

3.     As Managing Member, I am the officer of the Debtor responsible for devising and implementing the Debtor's business plans and strategies, overseeing the Debtor's financial, operational and legal affairs, and supervising the maintenance of its books and records. In addition, in my capacity as the Manager, I have been involved in the Debtor's business plan and development process (the "Restructuring Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtor's indebtedness; (ii) managing professionals engaged by the Debtor in connection with the Restructuring Process; and, (iii) supervising the preparation of documentation needed to implement the Restructuring Process.

4.     Today (the "Petition Date"), the Debtor filed it voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of its Chapter 11 estates.

5.       The Debtor intend to operate its businesses and to manage its assets as Debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

6.       I am advised by counsel that this Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Southern District of Texas pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The Debtor have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of its estates. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 cases and in support of the Debtor's voluntary petition and First Day Motions.

8.       Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management teams and other personnel, my knowledge and review of relevant documents including the Debtor's books and records, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

9.       I am familiar with the contents of each First Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First Day Motion will provide an orderly transition of the Debtor into these

Chapter 11 cases and ultimately permit the Debtor to reorganize. Further, I believe the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtor's estate and stakeholders.

I.      **Overview of the Debtor's Business and History**

   A.      **The Debtor's Business**

   10.      The Debtor is a company principally providing crane and related services within the Texas oil and gas industry and construction sites, typically at wellhead/drill locations for oil and gas drilling operations and at construction sites.  Debtor's activities involve acquisition, renting, operating and disposition of crane and related assets currently deployed to various oil and gas and construction sites within South Texas.

   B.      **The Debtor's Corporate Structure**

   11.      Dalton Crane, a Texas Limited Liability, filed its Certificate of Formation on October 8, 2009 with the Texas Secretary of State.  Michael and Donna Dalton, parent to Joshua Dalton were the initial managing members.  Effective November 14, 2017, as referenced within that Membership Interest Acquisition Agreement, Michael and Donna Dalton conveyed all of its interest in Dalton Crane to Joshua Dalton, making Josh Dalton the sole member.

   C.      **The Debtor' History**

   12.      Dalton Crane was founded in 2009 to operate a crane service for South Texas oil and gas operators/drillers.  On November 14, 2017 – Josh Dalton purchased the interest of Michael and Donna Dalton – as set forth within paragraph 5 above.

   13.      Due to a variety of external economic factors that adversely affected the companies' operating performance beginning in late 2020, principally related to economic

trends in the oil and gas industry and later due to delays in obtaining parts for a substantial portion of its crane inventory resulting in business redirections and work slow downs and an inability to perform additional work, Dalton Crane elected to file for Chapter 11 relief.

      **D.**    **Debt Structure**

14.     As of the Petition Date, Dalton Crane assets are subject to a variety of security interests, principally evidenced by specific equipment financing and security agreements by specified lenders.  In addition, Dalton Crane executed a prepetition loan dated January 5, 2021, in the amount of $550,000.00 payable to First State Bank Ganado Banking Center  (the "Loan").  The Loan evidenced by a Commercial Security Agreement of even date providing liens and security interest in "accounts" and rights to payment arising out of the business of the Debtor and all "interests of the Debtor in any goods."  .  The Loan is guaranteed by Joshua Dalton.

**II.**    **Events Leading to the Debtor' Bankruptcy Filing**

15.     Events leading to the filing for relief are directly related to the decline of oil and gas prices industry over the last 2-1/2 years, coupled with equipment downtime related to parts unavailability resulting from COVID driven delivery problems.  Gross income has dropped significantly due to limited net income, restricting the ability to satisfy current obligations and limiting access to new jobs.  This decline in revenue cause by declining market prices and the increased equipment down time has resulted in cash flow deficiencies.

16.     As of the Petition Date, Dalton Crane continues to operate in approximately 11 well sites and other locations spread across South Texas.

17.     The Debtor has diligently evaluated, in consultation with its professionals, a number of options to address the Debtor's current financial issues. These efforts have included

considerations for the sale of Debtor's business and/or assets and attempts at capital restructure and refinance.  Ultimately those efforts were unsuccessful requiring Debtor to seek relief under the Bankruptcy Code.  Dalton Crane is in receipt of a Letter of Intent to purchase the going concern and/or specified assets and intends to pursue a sale within the bankruptcy process.

18.     The Debtor has commenced this case in order to fully implement its restructuring efforts and to deal with current operating liabilities.  The Debtor believes that sales efforts combined with an increase in oil and gas prices and a more efficient parts delivery system will result in sufficient cash and/or assumption of contracts to enable the Debtor to provide a substantial return to its creditors and potentially return a dividend to equity holders.

### III.    First Day Motions

19.     Concurrently with the Chapter 11 petitions, the Debtor is filing "first-day" applications and motions described below (collectively, the "First Day Motions"). The relief sought in the various First Day Motions will allow the Debtor to, among other things, (a) establish certain administrative procedures to promote a seamless transition into Chapter 11; (b) continue to operate effectively; and (c) protect its assets and interests from any actions that may be taken by third parties.

20.     I submit this Declaration in support of the Debtor's petition and First Day Motions filed with the Court in connection with the commencement of this case. Below is a brief discussion of the Debtor's First Day Motions and an explanation of why, in my belief, such motions are critical to the success of the Chapter 11 Cases. More detailed descriptions of the facts pertaining to the Debtor's operations and the bases for the requested relief in each motion can be found in the relevant First Day Motions.

21.     I have reviewed each of the First Day Motions (including the exhibits and

schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

22.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtor, in consultation with its professionals, to ensure the Debtor's immediate operational needs are met, and that the Debtor suffer no immediate and irreparable harm. At all times the Debtor's management and professionals remained cognizant of the limitations imposed on Debtor-in-possession and, in light of those limitations, the Debtor narrowed the relief requested at the outset of this case to those issues that require urgent relief to sustain the Debtor's immediate operability.

**A.      Motion for Authority to Use Cash Management System, Bank Accounts, and Business Forms; Perform Intercompany Transactions; Authority for Banks and Financial Institutions to  Honor and Process All Related Check and Electronic Payment Requests**

23.     By this motion (the "Cash Management Motion"), the Debtor seeks entry of an order (i) authorizing the Debtor to, in the ordinary course of business, (a) use existing cash management system, pre-petition bank accounts, and pre-petition business forms (without reference to the Debtor's status as a debtor-in-possession) and (ii) authorizing the Debtor' banks and financial institutions to (a) maintain, service, and administer the Debtor' bank accounts and (b) honor and process all related checks and electronic payment requests consistent with the relief requested herein, and (iii) waiving the Debtor' compliance with the

guidelines set forth in section 345(b) of the Bankruptcy Code.

24.     The Debtor has an established cash management system they utilize to collect, manage, and disburse funds used in the Debtor's operations in the ordinary course of business (the "Cash Management System") through American Eagle Logistics, LLC ("American Eagle").   American Eagle has entered into a Terminal Commission Agency Agreement and has entered into several equipment lease agreements, providing for use of Debtor's equipment and terminals and for the condition of accounts receivables in relation to various jobs engaged in by Debtor, for which American Eagle collects job proceeds and pays such proceeds to Debtor net of a 15% commission.

25.     The Cash Management System enables the Debtor to facilitate its cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over its bank accounts.

26.     As discussed in greater detail in the Cash Management Motion, as of the Petition Date, the Debtor maintains its bank accounts with Prosperity Bank and The First State Bank.

27.     The Debtor currently generates and receives cash from the revenue generated pursuant to the operation of the Debtor's cranes and equipment, which is paid to American Eagle, which deducts 15% and pays the remaining balance to Debtor.  In exchange therefore American Eagle provides contracts to Debtor and collects all receivables.

28.     In connection with the Cash Management System, the Debtor maintains two (2) operating accounts (the "Bank Accounts").  In the ordinary course of business, the Debtor routinely transfers money between the Bank Accounts via wire transfers and other electronic funds transfers. There could be inflow with deposits and outflow with disbursements. The

amount of funds that flow through the Cash Management System is highly variable in that the funds are derived from production of oil and gas from numerous wells and is purchased at various price intervals depending on market updates.

29.     As of the Petition Date, the active Cash Management System consists of the agreements with American Eagle, and the operating accounts maintained at Prosperity Bank and First State Bank.

30.     Upon customer payment to American Eagle, and following deduction of 15% fee, the remaining balances are deposited into Debtor's accounts for operations use.

The Debtor' Existing Business Forms and Checks

31.     In the ordinary course of business, the Debtor uses numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders, and invoices (collectively, the "Business Forms"). Given the Debtor's well established cash management structure, to minimize the expense to the Debtor' estates associated with developing and/or purchasing new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtor seeks authority to continue to use its Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtor's status as a debtor in possession.

Bank Fees and Charges

32.     In the ordinary course, the Debtor's Cash Management Banks (American Eagle/First State and Prosperity) charge, and the Debtor pays, honors, or allows the deduction from the appropriate account, certain service and other fees, costs, charges, and expenses (collectively, the "Bank Fees").

33.     The Debtor requests authority to use the Cash Management System during the

pendency of this Chapter 11 Case in accordance with the ordinary course of the Debtor's business.

34.    The Debtor further requests that the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts, (b) debit the Bank Accounts in the ordinary course of business on account of (i) all checks drawn on the Bank Accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts at the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (iii) all undisputed pre petition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of any aspect of the applicable Cash Management System, and (c) recognize and give effect to the transfers between the various Bank Accounts as contemplated herein.

35.    Furthermore, to guard against improper transfers resulting from the post-petition honoring of prepetition obligations, the Debtor requests that its banks be directed not to honor, subject to certain exceptions approved by the Court (such as employee benefits and utilities), any checks and disbursements, including automatic or "ACH" withdrawals drawn on the Debtor's bank accounts, or for obligations, prior to the Petition Date.

36.    Allowing the Debtor to maintain uninterrupted use of the Cash Management System and Bank Accounts will accomplish the dual goals of minimizing the disruption to the Debtor' operations and satisfying the United States Trustee's Operating Guidelines. To ensure that all transfers and transactions will be documented in its books and records, the Debtor will maintain records of all transfers within the Cash Management System.

37.     Here, the Debtor has utilized the Cash Management System as part of its ordinary and usual business practices and as such, the Debtor believe that use of the Cash Management System falls within the purview of ordinary course transactions permitted under section 363(c)(1) of the Bankruptcy Code. Moreover, appropriate circumstances exist for the Courts to authorize the Debtor's use of the Cash Management System under sections 363(b)(1) and section 105(a) of the Bankruptcy Code.

38.     As an initial matter, the relief requested in this Motion will help minimize any disruption in the Debtor's business operations during the period between the Petition Date and the Debtor's emergence from Chapter 11 and preserve the value of the Debtor's estate.

39.     Second, strict adherence to the Guidelines of the Office of the United States Trustee (the "U.S. Trustee Guidelines") will prove to be exceedingly burdensome to the Debtor and management, reduce efficiencies, and cause unnecessary expense. Absent the relief requested herein, the Debtor will be required to, among other things, (a) close all existing bank accounts and open new debtor in possession accounts, (b) maintain a separate debtor in possession account for cash collateral, (c) obtain checks that bear the designation "debtor in possession", and (d) create new systems for manually issuing checks and paying post petition obligations. The delays that will result from opening the new accounts and revising cash management procedures would disrupt the Debtor's business operations at this critical time, have little or no benefit to the Debtor's estate, and potentially erode the value of the Debtor's business. Accordingly, the Debtor should be allowed to use the Cash Management System consistent with the ordinary course of the Debtor' business.

40.     The Debtor uses numerous varieties of Business Forms in the ordinary course of business. By virtue of the nature and scope of the Debtor's business operations, and in

order to minimize expenses to the Debtor's estate, it is important that the Debtor be permitted to continue using the existing Business Forms without alteration or change, except as requested herein.

41.     Furthermore, parties doing business directly with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the communications and notice of the commencement of these Chapter 11 Cases that the Debtor will distribute to such parties. Accordingly, the requirement to change the Business Forms is unnecessary, would be unduly burdensome, and should be waived.

42.     The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Given the Debtor's current operations, it is necessary for the Debtor to conduct transactions by debit, wire, automated clearing house ("ACH") transfers, ACH credit, ACH debit, and other similar methods of electronic transfers. Denying the Debtor the opportunity to conduct transactions by these methods would likely interfere with the Debtor's performance under its contracts and obligations, unnecessarily distract the Debtor and its management from the Debtor's business operations, and create additional costs to be borne by the Debtor and its creditors. Accordingly, the Debtor believes that it is imperative that the Cash Management Banks be authorized to continue to pay, honor, and execute any and all debit instructions, wires, ACH payments, and other forms of electronic transfers issued and drawn on the Bank Accounts after the Petition Date.

43.     Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estates, creditors, and other parties in interest, and should be granted in all respects. Moreover, this relief is necessary to avoid

immediate and irreparable harm to the Debtor and its estate.

44.      The Debtor anticipates that the United States Trustee will soon schedule the meeting of creditors required by section 341 of the Bankruptcy Code in accordance with Bankruptcy Rule 2003(a), but that the United States Trustee may desire to instead schedule the meeting after the Debtor' Schedules and Statements are filed. To the extent such relief is necessary, the Debtor also requests the Court authorize the United States Trustee to schedule the Section 341 meeting after the 40-day deadline imposed by Bankruptcy Rule 2003(a).

45.      The Debtor operates on a monthly accounting cycle beginning 1st of the month and ending last day of the month ("Monthly Accounting Cycle").  As of the Petition Date, the Debtor last complete Monthly Accounting Cycle ended on August 31, 2021.

**B.      Motion for Order Authorizing Debtor to Pay Pre-Petition Wages and Other Compensation, and Employee Benefits, and Continue Existing Employee Benefit Plans and Programs; Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests; Approving the Debtor' Discretionary Employee Incentive Programs**

46.      By this motion, the Debtor is seeking an order (i) authorizing the Debtor, in its sole discretion, to (a) pay pre-petition and post-petition wages and other compensation, employee business expense allowances and reimbursements, employee benefits, and (b) continue existing employee benefit plans and programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, and (iii) approving the Debtor's discretionary employee incentive programs.

47.      The Debtor's success in its restructuring efforts will be highly dependent on the continued support and performance of its workforce.

48.      Debtor Dalton Crane has 44 employees.  Dalton Crane employs the employees

who perform a broad spectrum of services for the Debtor, including, without limitation, labor, finance and accounting, and information technology services (the "Employees").

49.     In connection with the salaries and wages paid to Employees, Management also handles as required by law withholding from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare Taxes (collectively, the "Employee Withholding Taxes") and remit same to the applicable taxing authorities.  Dalton Crane also handles deduction of certain amounts from Employees' paychecks, including, without limitation, garnishments, child support and service charges, and similar deductions.

50.     The Debtor has structured the employment of employees this way to efficiently reduce overhead expenditures and take advantage of the cost savings associated with consolidating back office functions with the other non-debtor companies affiliated with Dalton Crane.

51.     A vast majority of the Employees rely exclusively on the payments and other benefits they receive from the Debtor for its basic living necessities. If the Debtor does not pay the obligations for compensation, benefits and reimbursable expenses, the Employees will face significant financial difficulties. Moreover, Employee morale and loyalty will be jeopardized at a time when the support of the Employees is critical to the Debtor's success. In the absence of honoring the Debtor's pre-petition obligations to the Employees, the Employees may seek alternative employment opportunities. Accordingly, it is essential to pay and honor obligations to Employees.

52.     By this Motion, the Debtor requests authority to pay all wages to the Employees in the ordinary course of business. The Debtor has made careful inquiries and has taken diligent steps to ensure that none of the Employees are owed more than current accrued

wages as of the Petition Date. Accordingly, the Debtor believes that no individual Employee will be paid more than the statutory priority cap if this Court grants the requested relief.

Employee Business Expenses

53.     In the ordinary course of the Debtor's business and as is customary with most large businesses, the Debtor reimburse employees for certain expenses Employees incur in the scope of its employment (the "Reimbursable Expenses"). Most Employees initially incur and pay such expenses by using corporate credit cards. The Reimbursable Expenses are largely composed of ordinary and necessary expenses including cell phone, interne, hotel and airfare charges, meals, equipment, tolls, parking, mileage, employee incentives, and postage.

54.     It would be patently inequitable to require Employees to personally bear any approved business-related expenses they incurred in furtherance of its responsibilities as Employees.

55.     Accordingly, the Debtor requests authority, in its discretion and in the exercise of its business judgment, to continue to honor all of the Employees Reimbursable Expenses in the ordinary course of business, regardless of when such obligations arose and to continue to use the corporate credit cards

Vacation, Sick, Holiday and Leave Benefits

56.     Dalton Crane provides certain of the Employees with paid vacation time (the "Vacation Time") as well as paid sick time and other paid time off (collectively, with the Vacation Time, the "Paid Time Off"). These programs are typical and customary, and continuing to offer them is necessary for the Employees to remain during the reorganization process.

57.     Because Vacation Time and Paid Time Off are accrued and used by Employees

on a continuous basis, it is difficult to precisely quantify the cost of accrued Vacation Time and Paid Time Off as of the Petition Date.

58.     By this Motion, the Debtor seeks authority to: (a) continue to provide Paid Time Off to the Employees in the ordinary course of business; and, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees it owes to Employees on account of Paid Time Off to the extent that such amounts remain unpaid as of the Petition Date.

59.     The Debtor also seeks authority to pay Payroll Taxes and other Deductions to the appropriate entities. These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for withholding from Employees' paychecks. Indeed, certain withholdings, including child support and alimony payments, are not property of the Debtor's estate because the amounts were withheld from Employees' paychecks on another party's behalf. In addition to causing undue hardship to certain Employees, the failure to pay such Payroll Taxes and Deductions may result in the Debtor being inundated with inquiries from taxing authorities and garnishors regarding its failure to submit, among other things, taxes and child support and alimony payments, which are not the Debtor' property but have been withheld from Employee paychecks. Moreover, if the Debtor cannot remit these amounts, the affected Employees may face legal action and/or imprisonment due to the Debtor's failure to submit these payments.

60.     Further, applicable federal and state laws require the Debtor/Management to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. Moreover, because the Payroll Taxes are not property of the Debtor' estates, the Debtor request that the Court authorize the Debtor to transmit the Payroll

Taxes to the proper parties in the ordinary course of business.

61.     The Debtor submits that the relief requested herein will benefit the Debtor's estate and creditors by allowing the Debtor's business operations to continue without interruption while the Debtor seeks to consummate its proposed restructuring. Absent such payments, the Employees may seek alternative employment opportunities. Such a development will deplete the Debtor's workforce, hinder or preclude the Debtor's ability to meet its customer obligations at a time when the Debtor seeks to conduct operations in a "business as usual" manner.

### C.     Motion to Establish Critical Vendor Payment Procedures

62.     By this motion, the Debtor seeks authority to establish critical vendor payment procedures. In its day-to-day operations, the Debtor heavily relies on many suppliers and service providers. The Debtor believes that the goods and services supplied by certain of its vendors are critical to its operations in that its business, or some arm of its business, could not continue to operate without access to such goods and services. As of the Petition Date, many of the vendors deemed critical by the Debtor has outstanding claims against the Debtor arising from prepetition deliveries of goods and prepetition performance of services. The Debtor anticipates they will be able to continue to transact with a majority of the vendors on which its day-to-day business operations depend despite nonpayment by the Debtor of such vendors' prepetition claims. Nonpayment of the prepetition claims of certain of the Debtor's vendors, however, creates a significant risk of disruption to the Debtor's operations. Thus, the Debtor anticipates there will be instances in which payment of the prepetition claims of certain vendors will benefit all creditors because such payment will allow the Debtor's business to continue and avoid a likely loss, or to gain a likely economic advantage, disproportionate to

the amount of such vendors' prepetition claims.

63.     Accordingly, the Debtor requests that the Court establish Critical Vendor Payment Procedures (as defined below) by which the Debtor may pay certain amounts to Critical Vendors (as defined below). In exchange for payment by the Debtor of any Critical Vendor Claim (as defined below), the Debtor intend to require such Critical Vendor to agree to transact with the Debtor, for such duration of time as agreed between the Debtor and such Critical Vendor on Customary Trade Terms (as defined below), unless otherwise agreed by the Debtor and the Critical Vendor.

64.     The Debtor is in the process of evaluating the goods and services vendors likely to have outstanding claims against the Debtor as of the Petition Date. The Debtor is in the process of analyzing which of its providers of goods or services are critical to its ability to operate its business and this would qualify as either Critical Vendors, and believe that numerous will so qualify.

65.     The Debtor is distinguishing "Critical Vendors" according to the following criteria:

      a.     Whether (i) the goods and services supplied by a particular vendor are essential to the continued operation of the Debtor's business or some arm thereof and cannot be obtained from any other vendor, or, could be obtained from another vendor only at such extra cost or at such delay as to outweigh the cost of paying the prepetition claim, or (ii) whether the vendor was in possession of valuable property of the Debtor that is necessary to its ability to generate revenue;

      b.     Whether the cost of paying the prepetition claim of such vendor, to the extent that such claim is fixed, noncontingent, liquidated, and undisputed (the "Critical Vendor Claim"), is outweighed by the benefit such payment is likely to secure on behalf of the Debtor's estates and other creditors; and

      c.     Whether such vendor would likely continue doing business with the Debtor notwithstanding nonpayment of prepetition claims, such as

those vendors subject to longterm, non-terminable contractual commitments.

66.     According to the above criteria, the Debtor is considering, from the several thousands of vendors with whom the Debtor deal, a small group of vendors that the Debtor will likely deem to be Critical Vendors. These vendors provide goods, and services to the Debtor necessary to enable the Debtor to retain its reputation, customer loyalty, and goodwill. In addition, many of the potential Critical Vendors are small companies and any one payment by the Debtor represents a significant portion of its income.

67.     Failure to obtain the necessary goods and services from such vendors would irreparably harm the Debtor's reputation and could result in loss of customer confidence, loyalty and patronage in favor of one of the Debtor's competitors. The Debtor's perceive a risk that, for certain of its Critical Vendors, a default by the Debtor would extinguish the Debtor's access to necessary goods, and services, because (i) the vendor providing the particular good or service will be put out of business by the Debtor's nonpayment, (ii) because the vendor will refuse to continue doing business with the Debtor if its prepetition claim remains unpaid, or (iii) because the vendor may choose to continue doing business with the Debtor only upon the condition that the Debtor provide trade term accommodations such as advance deposits or payments by wire transfer prior to delivery. Additionally, the Debtor believes that vendors in possession of the Debtor's property may assert liens on such property and/or will not return such property to the Debtor in the ordinary course of business as long as its prepetition claims remain unpaid.

68.     The Debtor anticipates that there may be instances in which the Debtor will require authority to pay the prepetition claim of a Critical Vendor that has refused to continue to deal with the Debtor, that is at risk of going out of business, or that has demanded trade term

accommodations the Debtor cannot meet, because the Debtor will be unable to operate its business or an arm thereof without the goods, and services provided by such Critical Vendor. The Debtor feels they will not be able to fulfill its duty to its estate and creditors to preserve the value of its business without the authority to pay the prepetition claims of those vendors the Debtor has identified as Critical Vendors as and when such payments prove necessary.

69.     Accordingly, the Debtor proposes the establishment of the following procedures for payment of prepetition claims of Critical Vendors if and when such payments become necessary (the "Critical Vendor"):

    a.    First, to the extent an entity claims a lien against property of any of the Debtor's estate to secure a Critical Vendor Claim (which lien, upon advice of counsel, the Debtor reasonably believe to be valid) and to the extent payment of such Critical Vendor Claim is, in the exercise of the Debtor's business judgment, in the best interests of its estates (to include agreeing to Customary Trade Terms, defined herein), the Debtor is authorized to pay up to 75% payable over 90 days – 1/3 per month of such Critical Vendor Claim (with the balance agreed to be treated as an unsecured claim) The Debtor shall file with the Court and provide to the United States Trustee for the Southern District of Texas (the "U. S. Trustee"), and any committee approved under section 1102 of the Code (the "Creditors Committee," and, together with the U.S. Trustee, the "Notice Parties") an accounting, itemized by claims paid, of any debts so paid.

    b.    To the extent an entity asserts any Critical Vendor Claim, the payment of which the Debtor, upon advice of counsel, reasonably believe would be authorized under existing laws related to critical vendors and payment is in the best interests of the estates (to include agreeing to Customary Trade Terms, defined herein), the Debtor may pay up to 75% payable over 90 days – 1/3 per month of such claim (with the balance to be treated as an unsecured claim) The Debtor shall file with the Court, and provide to the Notice Parties an accounting of each such claim paid, including the bases on which payment of such claim is warranted under existing law. Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtor (and the creditor paid) shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized. If the Court determines that a payment was not properly authorized, the Debtor

is authorized to, in its discretion and without further order of the Court, declare that payments made to such Critical Vendor on account of its Critical Vendor Claim shall be deemed to have been in payment of then outstanding post-petition claims of such vendor without further order of the Court or action by any person or entity. In addition, such Critical Vendor shall immediately repay to the Debtor any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the post-petition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

c.   Any entity provided with a copy of the Order authorizing these procedures shall be deemed on notice that a refusal to provide post-petition goods, or services to the Debtor by reason of non-payment of any prepetition debt, and despite assurance, in the form of a deposit or prepayment, that such entity will suffer no loss through provision of post-petition goods or services, absent good cause, constitutes a willful violation of section 362(a)(6) of the Code.

70.   As a prerequisite to payment of any Critical Vendor Claim, the Debtor intends to require Critical Vendors to agree to transact with the Debtor post-petition on Customary Trade Terms (as defined below) for such duration of time as agreed to by the Debtor and the particular Critical Vendor, unless otherwise agreed to by the Debtor and the particular Critical Vendor.

71.   "Customary Trade Terms" are those trade terms, which include, but are not limited to, credit terms, credit limits, historical pricing conventions, historical product volumes, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability and other applicable terms and programs acceptable to the Debtor, that were most favorable to the Debtor and in effect between such Critical Vendor and the Debtor at any time during the 12 month period preceding the Petition Date; provided however, notwithstanding the foregoing, payment terms shall be no less favorable than either 'net 30' (paid 30 days from invoice date) or "net 10 — 2%" (which provides for a 2% invoice discount if the invoice is paid 10 days from invoice date). If after receipt of payment for any Critical Vendor Claim, a

Critical Vendor refuses to continue to provide product, supplies or services upon the Customary Trade Terms as agreed to with the Debtor, then the Debtor may (i) declare that any payment made to such Critical Vendor on account of its prepetition claim shall be deemed to have been in payment of then outstanding post-petition claims of such Critical Vendor without further order of the Court or action by any person or entity; (ii) require that the Critical Vendor immediately repay to the Debtor any payments made to it on account of its prepetition claim, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and (iii) seek redress with the Court for failure to comply with the Customary Trade Terms.

72.    In the present case, many of the Critical Vendor claims will be entitled to priority status as administrative expenses and likely payment in full pursuant to section 503(b)(9) of the Bankruptcy Code because such claims arise from the delivery of goods to the Debtor, in the ordinary course of business, within the 20-day period preceding the Commencement Date.

73.    The Debtor submits that many of the Critical Vendor Claims likely arise from the delivery of goods to the Debtor in the ordinary course of business within the 20-day period preceding the Commencement Date. As such, these Critical Vendor Claims would likely be entitled to administrative expense status and to payment in full ahead of general unsecured creditors. Therefore, authorization of payment of many of the Critical Vendor Claims would not unfairly discriminate against the Debtor' other unsecured creditors and raises merely an issue of timing.

74.    Establishment of the Critical Vendor Payment Procedures by which the Debtor may pay the claims of those vendors whom the Debtor has distinguished as Critical Vendors is

warranted. The Critical Vendor Payment Procedures will allow the Debtor to pay the Critical Vendor Claims, many of which will likely be entitled to priority administrative expense status pursuant to Bankruptcy Code section 503(b)(9). The Critical Vendor Payment Procedures will also ensure that no Critical Vendor holds the Debtor hostage and unreasonably demands payment of its prepetition claims. The Debtor believes that authority, but not direction, to pay the Critical Vendor Claims, as such payments become necessary, is crucial for the Debtor's seamless transition into Chapter 11, will avoid immediate and irreparable harm, and will serve the best interests of the Debtor, its estate, and its creditors.

> **D.     Motion for Order Determining That Utility Providers Have Been Provided With Adequate Assurance of Payment; Approving Proposed Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services; Determining That Debtor Is Not Required to Provide Any Additional Assurance**

75.     Debtor seeks an Order (i) determining that utility providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the proposed adequate assurance, (ii) approving the adequate assurance procedures as proposed in the motion, (iii) prohibiting utility providers from altering, refusing, or discontinuing utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the adequate assurance procedures, and (iv) determining that the Debtor is not required to provide any additional assurance beyond what is proposed in this motion.

76.     The Debtor incurs utility expenses for electricity, telephone, water, waste disposal, internet, and other essential services (collectively "Utility Services") in the ordinary course of its business. The utility providers (as that term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") that deliver Utility Services to the

Debtor as of the Petition Date include, but are not limited to, those listed on Exhibit B attached to the motion (the "Utility Provider List"). On average, the Debtor spends in the aggregate approximately $2,600.00 each month on Utility Services.

77.     As of the Petition Date, the Debtor was current on its utility bills and obligations to Utility Providers.

78.     Preserving Utility Services on an uninterrupted basis to the Debtor's offices and oil and gas properties is essential to the Debtor's ongoing operations and to the success of its reorganization. Any unplanned interruption of utility services for even a brief period of time will negatively impact the Debtor's operations, customer and business relationships, revenues, and profits, seriously jeopardizing the Debtor's reorganization efforts. Thus, it is imperative that the Utility Providers continue to provide its  Utility Services without interruption.

79.     Accordingly, the Debtor seeks approval of the proposed adequate assurance procedures described below in the event that any Utility Provider makes a demand for adequate assurance or otherwise threatens to alter, refuse, or discontinue Utility Service to the Debtor.

Proposed Adequate Assurance

80.     The Debtor is current on all obligations for Utility Services to its  Utility Providers. The Debtor intends to pay its  post-petition obligations owed to the Utility Providers in the ordinary course, and by this motion also seek to pay all pre-petition amounts, as well, as adequate assurance of payment for Utility Services, in lieu of an additional deposit. The Debtor believes that payment of prepetition amounts is in the best interest of the estates because the Debtor is current on all obligations to Utility Providers and posting, by way of example, one additional month of estimated service for each Utility Provider would far exceed

and actually be a greater detriment to the Debtor's cash flow than simply paying the Utility Providers in the ordinary course of business, to include payment of prepetition amounts.

81.     The Debtor also requests, as additional adequate assurances, that the Utility Providers be allowed to continue to debit the Debtor's bank accounts for Utility Services, in the ordinary course of business.

82.     The Debtor asserts that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from business operations, as well as expected debtor-in-possession financing.

83.     The Debtor submits that payment of any prepetition amount owed, in the ordinary course of business, and in conjunction with the continued ability to debit the Debtor's accounts for amounts owed, demonstrates the Debtor's ability to pay for future Utility Services in the ordinary course of business and constitutes adequate assurance to the Utility Providers (the "Proposed Adequate Assurance").

Proposed Adequate Assurance Procedures

84.     Notwithstanding the Proposed Adequate Assurance and the fact that many Utility Providers are holding individual pre-petition Security Deposits, if any Utility Provider believes that additional adequate assurance is required, it may request such additional assurance pursuant to the procedures described below (the "Adequate Assurance Procedures"):

        a.      Any Utility Provider requesting additional assurance of payment in the
                form of deposits, prepayments, or otherwise must serve a request for
                additional assurance (an "Additional Assurance Request") so that it is
                received by the following parties: (i) the Debtor, P.O. Box 725, Edna,
                Texas 77957; (ii) proposed counsel to the Debtor, Michael G. Colvard,
                Martin & Drought, P.C., Weston Centre, 112 East Pecan Street, Suite
                1616, San Antonio, Texas 75205; (iii) the Office of the United States
                Trustee for the Southern District of Texas (the "U.S. Trustee"), 515

Rusk Street, Suite 3516, Houston, TX 77002 (collectively, the "Notice Parties").

b.      Any Additional Assurance Request must (i) be made in writing, (ii) set forth the location for which Utility Services are provided, (iii) include a summary of the Debtor's payment history relevant to the affected account(s), including any Pre-petition Security Deposits, and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient adequate assurance of future payment in accordance with section 366 of the Bankruptcy Code.

c.      Upon the Debtor's receipt of any Additional Assurance Request in accordance with the notice procedures described above, the Debtor shall have the greater of (i) twenty (20) calendar days from the receipt of such Additional Assurance Request or (ii) thirty (30) calendar days from the Petition Date (collectively, the "Resolution Period") to negotiate with the Utility Provider to resolve such Utility Provider's Additional Assurance Request.

d.      The Debtor may, in its sole discretion, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court, and may, in connection with any such agreement, in its sole discretion, provide a Utility Provider with additional assurance of future payment, including, but not limited to, cash deposits, prepayments, or other forms of security, without further order of the Court if the Debtor believes that such additional assurance is reasonable. Any such agreement may include a recharacterization of some or all of the Debtor's payment for prepetition Utility Services as a post-petition Adequate Assurance deposit.

e.      If the Debtor determines that the Additional Assurance Request is not reasonable and is not able to reach an alternative resolution with the Utility Provider during the Resolution Period, the Debtor, during or immediately after the Resolution Period, will request a hearing before the Court to determine the adequacy of assurances of payment with respect to such Utility Provider (the "Determination Hearing") pursuant to section 366(c)(3) of the Bankruptcy Code. Any Determination Hearing scheduled will be without prejudice to the Debtor to seek return of any prepetition payments for Utility Services provided as Adequate Assurance, should the Utility Provider request additional security deposits as adequate assurance.

f.      Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be prohibited from discontinuing, altering, or refusing service to the Debtor for any reason, to include

on account of any objections to the Proposed Adequate Assurance.

g.     The Debtor will either fax, e-mail, serve by first class mail, or otherwise expeditiously send a copy of this Motion and the Orders, which include the proposed Adequate Assurance Procedures, to each Utility Provider within five business days after entry of the Orders by the Court.

h.     The Adequate Assurance Deposit attributable to each Utility Provider shall be returned to the Debtor on the earlier of (a) the Debtor's termination of such services from such provider; (b) the confirmation of a plan of reorganization; and (c) the conclusion of the Chapter 11 Case, if not applied earlier.

85.     The Debtor further proposes that all Utility Providers that do not timely file an objection to this motion, or make an Additional Assurance Request pursuant to the Adequate Assurance Procedures, be deemed to consent to the Proposed Adequate Assurance and be bound by any order entered by the Court granting this motion.

Modifications to Utility Provider List

86.     The Debtor intends to amend the Utility Provider List, in its sole discretion, to add any subsequently identified Utility Provider. The Debtor further proposes that the Order be deemed to apply to any such Utility Provider regardless of when a Utility Provider may be added to the Utility Provider List. The Debtor also will serve a copy of this Motion on any Utility Provider that is subsequently added to the Utility Provider List. Such subsequently added Utility Providers who object to Orders or to the entry of the Orders must file an objection in accordance with the Bankruptcy Rules, the Local Rules of Court, and the Adequate Assurance Procedures.

87.     Here, the Debtor believes that the Utility Providers have "adequate assurance of payment" even without the proposed Adequate Assurance Deposit. As described above, the Debtor anticipates having sufficient resources to pay, and intend to pay, any and all valid post-

petition obligations for Utility Services in a timely manner. In addition, the Debtor's reliance on Utility Services for the operation of its business provides them with a powerful incentive to stay current on its utility obligations. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payments other than staying current on both pre and post-petition amounts owed are required in the Chapter 11 Case. The Debtor submits that the Proposed Adequate Assurance is sufficient to assure the Utility Providers of future payment.

88.     Notwithstanding the foregoing, the Debtor believes that the Proposed Adequate Assurance and the Adequate Assurance Procedures are reasonable, satisfy the requirements of section 366 of the Bankruptcy Code, and are necessary for the Debtor to carry out its reorganization efforts. If they are not approved, the Debtor could be forced to address payment requests by Utility Providers in a disorganized manner, which would distract management from focusing on the Debtor's reorganization. Moreover, on the 30th day following the Petition Date, the Debtor could be surprised by a Utility Provider unilaterally (a) deciding that it is not adequately protected, (b) making an exorbitant demand for payment to continue service, or (c) discontinuing service. Such discontinuation of or higher payment demands for Utility Services could jeopardize the Debtor's reorganization efforts.

89.     The proposed Adequate Assurance Procedures are necessary for the Debtor to carry out its restructuring efforts. If the Court does not approve the proposed Adequate Assurance Procedures, the Debtor could be forced to address requests from Utility Providers in a disorganized manner at a critical point in the restructuring process.

90.     In this case, preserving Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations. Indeed, any interruption in Utility Services, even for a brief

27 | P a g e

period of time, would immediately and irreparably harm the Debtor's business. Accordingly, it is imperative that the Utility Providers continue to provide its  Utility Services without interruption.

  **E.**  **Motion for Authority for the Debtor to Use Cash Collateral, Obtain Debtor In Possession Financing, and Determining Adequate Protection, Superpriority Claim and Liens**

  91.  To continue its operations in an orderly manner on a post-petition basis, the Debtor need immediate authority to utilize cash collateral secured by liens on the property of Interests, secured creditor The First State Bank.  The Debtor intends to utilize accounts receivable process and cash on deposit to operate in the ordinary course of business during these bankruptcy Cases.

  92.  The Debtor further seek permission from this Court to use cash collateral, as set forth in the Budget, to fund ongoing operations.

  93.  The Debtor require immediate access to the cash collateral to, among other things, fund any interim obligations.

  94.  Accordingly, the Debtor requests that the Court authorize the Debtor to immediately use the cash collateral in the amounts set forth in the Budget, pending a final hearing. At the final hearing, the Debtor request that the relief requested be granted on a permanent basis.

  95.  It is believed that The First State Bank is willing to allow Debtor to use cash collateral to enable the Debtor to operate during these bankruptcy Cases, but on the terms described in the Motion.

  96.  Under the circumstances, the Debtor has concluded that The First State Bank is adequately protected.  On these facts, I believe the relief requested is warranted.

## IV.    Conclusion

97.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

/s/ Joshua Dalton

Joshua Dalton
CEO/Member