IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| DALTON CRANE, L.C. | § | |
| DEBTOR. | § | CASE NO. 21-33218 |

**MOTION FOR ORDER (I) APPROVING SALE PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES; (II) APPROVING PROCEDURE FOR GRANTING BID PROTECTIONS; (III) SCHEDULING OBJECTION DEADLINES AND THE HEARING TO APPROVE THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICES; (V) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF**

**AN ORDER WILL BE ENTERED GRANTING THE RELIEF REQUESTED HEREIN WITHOUT FURTHER HEARING UNLESS A WRITTEN OBJECTION AND REQUEST FOR HEARING IS FILED WITH THE CLERK WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF THE ISSUANCE OF THIS NOTICE. ANY SUCH OBJECTION MUST ALSO BE SERVED UPON THE MOVING PARTY AND UPON ALL OTHER PERSONS INDICATED ON THE CERTIFICATE OF SERVICE ATTACHED TO THIS PLEADING.**

TO THE HONORABLE EDUARDO V. RODRIGUEZ
UNITED STATES BANKRUPTCY JUDGE:

The Debtor hereby files its Motion for Order (i) Approving Sale Procedures Relating to Sale of Substantially All of the Estate's Assets Free and Clear of Liens and Encumbrances; (ii) Approving Procedure for Granting Bid Protections; (iii) Scheduling Objection Deadlines and the Hearing to Approve the Sale; (iv) Approving the Form and Manner of Notices; (v) Establishing Procedures Relating to Assumption Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; and (vi) Granting Related Relief (the "Sale Procedures Motion") pursuant to §§

105(a), 363, 365, 503, 507, 1107, and 1108 of the Bankruptcy Code[1], requesting that the Bankruptcy Court enter an order (a) approving sale procedures relating to a sale of substantially all of the assets associated with or related to the Debtor (the "Assets") pursuant to an Asset Purchase Agreement (the "Sale Contract") by and between the Debtor and a purchaser to be identified pursuant to the procedures set forth herein; (b) approving the procedure for granting bid protections; (c) scheduling objection deadlines, and a hearing (the "Sale Hearing") to approve the Asset sale; (d) approving the form and manner of notices, including notices relating to the objection deadline with respect to the Asset sale; (e) establishing procedures relating to the assumption and assignment of certain designated contracts, including notice of proposed cure amounts; and (f) granting related relief. In support of the Motion, the Debtor respectfully states as follows:

## I.  JURISDICTION

1. This Court has jurisdiction over this chapter 11 case and the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b), and venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  PROCEDURAL BACKGROUND

2. On October 1, 2021 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has been appointed in this case.[2]

3. Dalton Crane is a corporation organized under the laws of the State of Texas.

---

[1] "Bankruptcy Code" shall mean 11 U.S.C. §§ 101, *et seq.*
[2] A more detailed description of Debtor's business operations may be found in the Declaration of Joshua Dalton in Support of Debtor's Chapter 11 Petition and First Day Motions (the "First Day Declaration") [Dkt. No. 4].

-2-

-3-

### III. FACTS RELEVANT TO THE MOTION

4. Dalton Crane is an entity that operates in the crane industry. Specifically, Dalton Crane provides crane services to individual, commercial and oil and gas businesses.

5. The Debtor has worked hard, with its employees and extensive network relations to secure a strong market share in the South Texas crane industry and have excelled in both the oil and gas and commercial work sides. Dalton Crane has expanded into the solar industry and has secured long-term jobs installing solar panels. However, a series of unfortunate events precipitated a downturn in Debtor's business. Downturns in the oil and gas market resulted in business slow downs and lower pricing. Then following oil and gas price increases – service industry pricing remained depressed for contract service providers. Then due to the COVID pandemic, parts shortage followed by delivery problems reduced Daltons ability to maintain equipment availability thereby reducing job opportunities undermining Dalton Crane's ability to acquire more jobs and undermining revenue production, causing cash flow downturns and restructuring debt servicing capacities.

6. Debtor's post-petition business has been relatively successful resulting in net revenue in October/November of $126,000 and $100,000 respectfully. In addition Debtor has satisfied adequate protection obligations owed to several secured creditors. Debtor remains current on all post-petition obligations including taxes, wages and insurance and is willing to consider adequate protection payments to other equipment lenders.

7. Debtor believes it is in the best interest of the estate as well as its creditors and all parties in interest to sell substantially all of its assets. Debtor also believes that such a sale is the best way to maximize the value of these assets of the Debtor's estate for its creditors and stakeholders under the circumstances.

## IV. RELIEF REQUESTED

8. By this Motion, the Debtor requests that the Court enter an Order substantially in the form attached hereto as **Exhibit "A"** (the "Bid Procedures Order") granting Debtor authority to engage in a sales procedure designed to sell all or substantially all of its assets (collectively, the "Assets"), concurrently herewith Debtor has filed a Motion to Approve a Broker/Auctioneer – who is to:

    i. Provide a minimum guaranteed sale price;

    ii. Engage in a marketing process;

    iii. Determine qualified buyers;

    iv. Obtain purchase agreements; and,

    v. Auction remaining assets.

The Debtor believes that the procedures proposed herein with respect to the sale of the Assets (the "Sale") are the best way to maximize the value of these assets for the Debtor's estate for its creditors and stakeholders under the circumstances.

### A. The Marketing Process

9. Debtor engaged in numerous exploratory discussions with prospective buyers and brokers/auctioneers regarding the market potential of Debtor and a potential sale.

10. Debtor is preparing and will file its Application for Entry of an Order Authorizing the Employment and Retention of a Broker/Auctioneer (the "Motion to Employ Broker/Auctioneer") with the expectation that Broker/Auctioneer will assist Debtor in implementing a marketing and sale process for the Assets in Chapter 11, which may include competitive bidding within a turnkey sale (the "Sale"), or alternatively an auction (the "Auction") within a minimum guaranteed amount of sales proceeds, net of all equipment (the "Guaranteed Amount").

11. The Debtor with the assistance of Broker/Auctioneer will assemble data and documents in a virtual data room in order to assist potential buyers in conducting diligence and evaluating whether to submit an offer to acquire the Assets. The aim is to initiate formal marketing processes by the latter portion of this month.

12. Based on the marketing process and diligence completed to date, the Debtor, has concluded that: (a) a prompt and open sale of the Assets in which all interested buyers are encouraged to participate is the best way to maximize value for the estate under the circumstances and (b) the proposed Bid Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets.

**B.     The Bid Procedures**

13. The Debtor propose to conduct the sale of its Assets through the sale and bidding process described below (the "Proposed Sale Process") to ensure that its estate realizes the maximum value for the Assets. The Assets shall be sold in the aggregate to one or more purchasers (each, a "Purchaser"), as may be determined by the Debtor in its business judgment.

14. To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor will provide proposed bid procedures to govern the Sale (the "Bid Procedures").  The Bid Procedures are designed to encourage all entities to put its best bids forward and to maximize the value of the Assets.

15. The Debtor requests that this Court approve the Proposed Sale Process and the Bid Procedures, the material terms of which are as follows:[3]

---

[3] This summary is qualified in its entirety by the Bid Procedures. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bid Procedures. To the extent there are any conflicts or inconsistencies between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern in all respects.

**Provisions Governing Qualifications of Bidders and Bids**

- Parties who may be interested in purchasing the Assets should contact Debtor's broker/auctioneer, e-mail: (intentionally blank) _____, and request a confidentiality agreement (a "Confidentiality Agreement"). Upon execution of a Confidentiality Agreement, parties will be given access to the Debtor's on-line data room (the "Due Diligence Data Room") and may begin conducting due diligence.

- **Identification of Stalking Horse Bid**: In the event the Debtor, with the consent of the Lenders (as such term is defined in the DIP Order, and such consent not to be unreasonably withheld), identify a stalking horse bidder (the "Stalking Horse Bidder") who agrees to place an initial bid (the "Stalking Horse Bid") to acquire substantially all of the Assets pursuant to a Stalking Horse Purchase and Sale Agreement (the "Stalking Horse PSA") within no less than ten (10) days prior to the Bid Deadline, the Debtor shall post the Stalking Horse PSA in the Due Diligence Data Room and will have Broker/Auctioneer notify all other current bidders and any subsequent bidders that a Stalking Horse Bidder has been chosen. To be the Stalking Horse Bid, such party must qualify and otherwise constitute a Qualified Bid. The Stalking Horse Bid shall be subject to higher and better offers to acquire the Assets at the auction, as well as overbid requirements.

- **Qualified Bids**. In order to constitute a Qualified Bid (as defined below), any proposal, solicitation or offer for the Assets (each, a "Bid") submitted by a bidder (each, a "Bidder") must (i) be submitted in writing prior to (intentionally blank)_____ at 12:00 p.m. (Central Time) (the "Bid Deadline") and (ii) satisfy the following requirements, as determined by the Debtor in its reasonable business judgment in consultation with the Lenders (collectively, the "Bid Requirements"):

    i. Contain a signed definitive purchase and sale agreement (together with a copy of the signed agreement that is marked to show changes from the Form PSA) (a "Qualified PSA") and shall: (i) identify the Assets the Bidder seeks to purchase, (ii) contain the form of and total consideration to be paid by such Bidder, including the amount of proposed cash consideration and the liabilities (executory contracts or leases) to be assumed, (iii) in the event there is a Stalking Horse PSA (those terms will be communicated to any subsequent party seeking to become a Qualified Bidder), be on terms no less favorable (in the Debtor's reasonable business judgment in consultation with the Lenders) than the Stalking Horse PSA, including after consideration of any break-up or expense reimbursement payable thereunder which dictates the amount necessary to be a Qualified Bidder, if any, and (iv) not be subject to any: (a) financing contingency, (b) contingency relating to due diligence after the Bid Deadline, (c) contingency relating to the approval of the Bidder's board of directors or other

       internal approvals or non-governmental third-party consents or approvals, or (d) any conditions precedent to the Bidder's obligation to purchase the Assets other than those included in the Form PSA.

ii. Be accompanied by the provision of a certified or bank check or wire transfer in the amount of at least 10% of the purchase price proposed in the Qualified PSA as a good faith deposit (the "Good Faith Deposit"). The Good Faith Deposit shall be held in Debtor's counsel's IOLTA account and credited to the closing payment if the Bidder is ultimately determined to be the Successful Bidder (as defined below), if any closing payment is due, or to be returned to the Bidder in whole or in part as applicable if the Bidder is not the Successful Bidder or the Backup Successful Bidder. In the event that a Bidder is selected as the Backup Successful Bidder, the Good Faith Deposit shall be returned to the Backup Successful Bidder within three (3) business days following the closing of a Sale to the Successful Bidder.

iii. Contain a written statement that the Bidder agrees to be bound by the terms of the Bid Procedures and the Bid Procedures Order and include a commitment that the Bidder shall (i) commence and complete all filings with respect to any necessary government and other approvals within three (3) days following the entry of the Sale Order (as defined below) with respect to the relevant Assets and (ii) consummate the purchase of the relevant Assets within ten (10) days following entry of the Sale Order.

iv. Identify, with particularity, each and every executory contract and unexpired lease it intends to assume; provided, however, that such list of contracts may be later modified to the extent permitted under the Qualified PSA.

v. Be accompanied by evidence satisfactory to the Debtor that the Bidder is willing, authorized (including by such Bidder's board of directors or comparable governing body), capable and qualified financially, operationally, legally and otherwise, of unconditionally performing all obligations under the Qualified PSA, including, without limitation, (1) all Assumed Obligations with respect to the relevant Assets and (2) the ability to provide adequate assurance of future performance under contracts and leases to be assumed pursuant to Section 365 of the Bankruptcy Code.

vi. Provide (i) that the Bidder agrees to serve as the Backup Successful Bid (as defined herein) if it is selected as the next highest and best bid after the Successful Bid is determined in accordance with the Bid Procedures and (ii) that the Bidder's Bid shall remain open and irrevocable until at least thirty (30) days after the entry of an order

    by the Court approving a definitive agreement providing for the Sale of those Assets.

  vii. Fully disclose the identity of each entity that will be Bid in any Auction scheduled by the Debtor.

  viii. Be submitted to (i) counsel for the Debtor, Michael G. Colvard, Martin & Drought, P.C., 112 East Pecan Street, Suite 1616, San Antonio, TX 78205, mcolvard@mdtlaw.com and (ii) (intentionally blank) _____ so as to be received not later than the Bid Deadline, (intentionally blank)_____ at 12:00 p.m. (Central Time). The Debtor may extend the Bid Deadline until the start of any Auction for one or more bidders without further notice, but shall not be obligated to do so.

- **Notice of Qualified Bidders**. A Bid that satisfies each of the Bid Requirements, as determined in the Debtor's reasonable business judgment after consultation with the Lenders, shall constitute a "Qualified Bid," and such Bidder shall be a "Qualified Bidder." The Debtor shall notify each Qualified Bidder that such party is a Qualified Bidder within two (2) days after the Bid Deadline.

- **Credit Bidding**. In the event the Debtor receive more than one Qualified Bid and determine, in the exercise of its sound business judgment, to schedule an Auction, any secured lender shall be entitled to credit bid all or a portion of the outstanding obligations under any corresponding secured loan agreement in accordance with Section 363(k) of the Bankruptcy Code, and it shall be deemed to be a "Qualified Bidder" for all purposes herein and any such bid shall be deemed to be a "Qualified Bid" for all purpose herein.

- **Evaluation of Competing Bids**. The Bid Procedures set forth various factors that will be considered by the Debtor in evaluating each Qualified Bid. The Debtor may evaluate competing bids in a manner that will maximize the aggregate value to its estate rather than maximize value from individual Assets.

- **Auction**. In the event the Debtor receives more than one Qualified Bid, the Debtor may determine, in the exercise of its sound business judgment, to schedule an Auction to request additional competitive bids from Qualified Bidders. In the exercise of the Debtor's sound business judgment—the highest and best Qualified Bid received to date shall serve as the "Baseline Bid" at the commencement of the Auction. The Debtor shall notify each Qualified Bidder of the contents of the Baseline Bid. The Baseline Bid shall be subject to higher and better Bids at the Auction, as described further below. If the Baseline Bid is in excess of any existing Stalking

> Horse Bid, then the Stalking Horse Bidder shall be entitled to the Breakup Fee (as that term is defined herein).

- **No Qualified Bids**. If the Debtor does not receive any Qualified Bids with respect to any or all of the Assets, other than the Stalking Horse Bid, the Debtor shall report the same to the Court, and shall promptly proceed to seek entry of the appropriate orders approving the Stalking Horse PSA, to the extent there is a Stalking Horse PSA.

- **No Stalking Horse or Qualified Bid.** If the Debtor does not receive a Stalking Horse proposal or a Qualified Bid, the Debtor and Broker/Auctioneer shall proceed with an auction sales process where under Broker/Auctioneer shall market and sell all available assets within an auction process conducted by Broker/Auctioneer. If an auction process does occur, Broker/Auctioneer has offered a minimum sales proceeds guaranty of $13.5 million. Lenders, credit bid rights are provided within an auction sale.

- **In the Event of an Inventory Sale.** In the event the Stalking Horse or a Qualified Bid does not result in the sale of all assets – the remaining unsold Dalton equipment assets will be sold by (intentionally blank) _____ within an auction process.

**Notice Procedures**

- **Notice of Auction and Sale Hearing**. After entry of the Bid Procedures Order, the Debtor will cause the Notice of Auction and Sale Hearing Date, (the "Sale Notice"), to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or overnight mail upon: (i) all entities known by the Debtor to have expressed an interest in a transaction with respect to the Assets during the past three (3) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; and (vi) upon all parties set forth in the Debtor's Service List maintained in this case (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above). If no Stalking Horse or Qualified Bid are received and Debtor is unable to secure a turnkey sale – an additional Notice of Auction Sale will be provided and noticed as set forth above.

- **Assumption and Assignment Notice**. As soon as is practicable after entry of the Bid Procedures Order, the Debtor will serve the Assumption and Assignment Notice, (the "Assumption and Assignment Notice"), by first

class mail, facsimile, electronic transmission, or overnight mail on (a) each counterparty under each potential Assumed and Assigned Contract (as defined below) (a "Contract Counterparty") and (b) its attorney, if known, in each case, at the last known address available to the Debtor. The Assumption and Assignment Notice shall set forth the following information: (i) the Contract(s) and/or Lease(s) that may be assumed by the Debtor and assigned to the Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); and (iv) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assumed and Assigned Contract, provided, however, that the presence of any Contract or Lease on an Assumption and Assignment Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.

**<u>Competitive Turnkey Sale</u>**

- **Turnkey Sale**. In the event that a Turnkey Sale involving competitive Qualified Bid is conducted, the Turnkey Sale will start on the date set forth on the Sale Notice but in no event later than (intentionally blank) _____ at 10:00 a.m. (Prevailing Central Time). The sale shall be held via video conference to promote social distancing. The virtual invite or "Meeting ID" shall be distributed via Notice of Meeting ID to be served via email and regular mail by Debtor's counsel on all Qualified Bidders should an Auction be necessary. Any Qualified Bidder wishing to participate in the Auction that does not have access to the video conferencing software that the Debtor/Broker/Auctioneer will utilize, then such Qualified Bidder shall be allowed to participate via teleconference using a conference line to be provided in the Notice of Meeting ID. To participate in the Auction, each prospective purchaser must be a Qualified Bidder. Each Qualified Bidder must have at least one (1) individual representative with authority to bind the Qualified Bidder attend the Auction via video conference or telephonic appearance. Only Qualified Bidders and its legal and financial advisors shall be entitled to attend and/or bid at the Auction. By attending the Auction, each party present at the Auction (whether by video conference or telephone) agrees to keep the Auction, the Bids at the Auction, and all details concerning the Auction confidential. The Auction shall be conducted in the presence of a certified court reporter who shall transcribe the Auction.

- A Qualified Bidder wishing to submit a bid higher than the Baseline Bid at the Auction must bid an amount greater than the total consideration contained in the Baseline Bid plus the Incremental Bid Amount (defined below) (the "Minimum Overbid").

  i. Subject to the Minimum Overbid, additional Qualified Bidders shall submit successive bids in increments of at least $25,000 (the "Incremental Bid Amount") for the purchase of the Assets for which it is bidding on until there is only one offer that the Debtor determines, subject to Court approval, is the highest and/or best offer for such Assets (a "Successful Bid" and such Bidder, the "Successful Bidder"). The second highest bid, to the extent determined to be acceptable to the Debtor, in consultation with the Lenders, shall be deemed to be the backup bid (the "Backup Successful Bid" and such Bidder, the "Backup Successful Bidder").

  ii. If the Successful Bidder is not the Stalking Horse Bidder, such Stalking Horse bidder shall be entitled to a break-up fee in an amount not to exceed 3% of the total actual purchase price (the "Breakup Fee").

  iii. All Bids made at the Auction shall remain open until the earlier of (i) if the Bidder submits the Successful Bid or is deemed to be the Backup Successful Bidder, thirty (30) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of those Assets to which it relates, and (ii) if the Qualified Bidder is not selected as a Successful Bidder or the Backup Successful Bidder, three (3) days after the end of the Auction with respect to the relevant Assets it has bid on.

- **Highest and/or Best Bid**. At all times during the Proposed Sale Process, the Debtor, in consultation with the Lenders, shall retain full discretion and right to determine which Bid or Bids constitutes the highest or otherwise best offer for the purchase of the Assets (whether in an aggregate sale to a single buyer or on an asset by asset basis), and which bid or bids should be selected as the Successful Bid(s), if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. The Debtor, with the consent (not to be unreasonably withheld) of the Lenders, may adopt rules, may adopt rules for the Auction that, in its judgment, will better promote the goals of the Auction and that are not inconsistent in any material respect with any of the other material provisions hereof or of any Court order.

- **Proceeds**. All valid and properly perfected liens against the Debtor's Assets shall attach to the proceeds of the Sale of such Assets. To be clear, the proceeds of the Sale of such Assets will be applied in accordance with applicable bankruptcy law.

- **Reservation of Rights**. The Debtor with the consent (not to be unreasonably withheld) of the Lenders, reserve the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth herein with respect to any or all Potential

Bidders and Bidders, imposing additional terms and conditions with respect to any or all Potential Bidders and Bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing.

**Sale Hearing**

- **Sale Hearing**. As soon as is practicable following the conclusion of the Sale or Auction, the Debtor will file notice of the results of the sale or auction and note the definitive purchase and sale agreement for the Successful Bid. The Debtor intends to present the Successful Bid(s) for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code at the final hearing to approve the Motion (the "Sale Hearing") to be scheduled by the Court and requested to be held on or before (intentionally blank) _____ and detailed in the Auction Sale/Notice. The Debtor shall be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a Sale of the Assets after the Sale Hearing because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid, the Backup Successful Bid shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Backup Successful Bid. Moreover, the failure to consummate a Sale of the Assets because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid shall result in a forfeiture of such proposed purchaser's Good Faith Deposit to the Debtor's estate and applied in accordance with applicable bankruptcy law.

- **Sale Implementation**. Following the approval of the Successful Bid(s) at the Sale Hearing, the Debtor will be authorized to take any and all actions necessary and appropriate to facilitate the closing of the Sale (the "Closing") and implement the transactions contemplated by the Successful Bid(s).

C.   **Assumption and Assignment of Leases and Contracts**

16.   In addition, to facilitate the sale, assumption, and assignment of the Leases and Contracts to be assumed and assigned to the Successful Bidder(s) (the "Assumed and Assigned Contracts"), the Debtor proposes to serve the Assumption and Assignment Notice as soon as practicable after the entry of the Bid Procedures Order and request that the Court approve the following procedures for fixing any cure amounts owed on the Leases and Contracts (the "Assumption and Assignment Procedures"). The Assumption and Assignment Notice shall set

forth the following information: (i) the Contract(s) and/or Lease(s) that may be assumed by the Debtor and assigned to the Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) the Cure Amount, if any, determined by the Debtor necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code; and (iv) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assumed and Assigned Contract.

17. All objections to any assumption and assignment of any Lease or Contract, including without limitation any objection to the Debtor's proposed Cure Amount or the provision of adequate assurance of future performance under any Lease or Contract pursuant to Section 365 of the Bankruptcy Code ("Adequate Assurance"), must: (a) comply with the General Objection Procedures (as defined in paragraph 26 below); (b) identify the Lease or Contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under Section 365 of the Bankruptcy Code (the "Cure Claim") and identify the basis(es) of the alleged Cure Claim under the Contract or Lease; (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance (collectively with the General Objection Procedures, the "Assigned Contract Objection Procedures").

18. If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (a) the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling notwithstanding anything to the contrary in any Contract or Lease or other document and the non-debtor party to the Contract or Lease shall be forever barred from asserting any other claim arising prior to the assignment against the Debtor or Purchaser as to such Contract or Lease if it is an Assumed and Assigned Contract, and (b) the

Purchaser's promise to perform under the Contract or Lease shall be deemed Adequate Assurance under the Contract or Lease. To the extent the Debtor dispute any Cure Claim, such dispute shall be presented to the Court at the Sale Hearing, or such earlier or later date and time as the Debtor and the objector may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of a Contract or Lease. All Cure Amounts shall be paid by the Purchaser.

19. While the Debtor has made a good faith effort to identify all Contracts and Leases to be assumed and assigned in connection with the Sale, they may discover additional Contracts and/or Leases that the Debtor and the Purchaser desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Bid Procedures Order the Debtor identify additional prepetition executory Contracts and/or Leases to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (whether before or after closing of any Sale(s) of relevant Assets), the Debtor shall serve a supplemental Assumption and Assignment Notice by first class mail, facsimile, electronic transmission, or overnight mail on the Contract Counterparty (and its attorney, if known) to each supplemental Assumed and Assigned Contract at the last known address available to the Debtor by no later than ten (10) days before the proposed effective date of the assignment. Each supplemental Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Contract Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtor and Purchaser to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned Contract, and (iv) the Cure Amount, if any.

20. Unless the Contract Counterparty or any other entity properly files an objection to the supplemental Assumption and Assignment Notice in accordance with the General

Objection Procedures (as defined below) within ten (10) days of the date of the Assumption and Assignment Notice, the Debtor may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing. If an objection is filed and served in accordance with the General Objection Procedures within ten (10) days of the date of the supplemental Assumption and Assignment Notice, and the objection cannot be resolved consensually, then the Debtor will request that the Court schedule a hearing to consider the objection.

**D.     Notice**

21.     The Debtor propose to give notice, immediately after the entry of the Bid Procedures Order, of the Bid Procedures, the Form PSA, the means to become the Stalking Horse Bidder, the Assumption and Assignment Notice, the time and place of the Auction, the Sale Hearing, and the Objection Deadline to all entities known by the Debtor to have expressed an interest in a transaction with respect to the Assets during the past three (3) months and upon all parties set forth in the Debtor's Master Service List maintained in this case. After entry of the Bid Procedures Order, the Debtor will cause the Sale Notice and the Assumption and Assignment Notice to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or overnight mail upon: (i) all entities known by the Debtor to have expressed an interest in a transaction with respect to the Assets during the past three (3) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; and (vi) upon all parties set forth in the Debtor's Service List maintained in this case (to the extent any party to receive notice thereby has not received notice pursuant to sections (i)

through (v) above). These notice procedures are not intended to limit or restrain marketing efforts with regard to the sale of all or substantially all of the Debtor's assets.

**E.      Objections**

22.     All objections to the Sale of the Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Bid Procedures Order must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (d) filed with the Bankruptcy Court, by no later than 5:00 p.m. (Central Time) on (intentionally blank)_____, _____ (the "General Objection Deadline") prior to the hearing on the Sale Procedures set for hearing on (intentionally blank)_____ at (time and court data) ; provided, however, that any party may object based on events occurring at the Auction until ___:00 p.m. (Central Time) on the day prior to the Sale Hearing; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"): (i) counsel for the Debtor, Martin & Drought, P.C., 112 East Pecan, Suite 1616, San Antonio, TX 78205, Attn: Michael G. Colvard; and (ii) Office of the United States Trustee for the Southern District of Texas, 515 Rusk Ave., Ste. 3516, Houston, TX 77002-2604, Attn: Stephen Statham. These procedures are collectively referred to as the "General Objection Procedures". Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the relevant hearing.

### V.      BASIS FOR RELIEF REQUESTED

23.     This Court should approve the proposed Sale Procedures because they will promote the sale of the Assets in a manner that results in the maximum return for the Debtor's estate and its creditors. The Debtor believes that the Sale Procedures are (a) sufficient to solicit

bids for the Assets; (b) consistent with other procedures previously approved by bankruptcy courts; and (c) appropriate under relevant standards governing the sale of assets in bankruptcy proceedings.

24. Once a debtor articulates a valid business justification for proposed sale procedures, its justification is evaluated according to the business judgment rule, which is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Il. 1995); *see also In re Broughton Ltd. P'ship*, 474 B.R. 206, 218 (Bankr. N.D. Tex. 2012) (*citing In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[T]he court relies on an estate representative's sound business judgment in approving acts outside the ordinary course of business."); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions.").

25. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., In re Redwine Res.*, 2010 WL 5209287 at *2 (Bankr. N.D. Tex., June 24, 2010) (approving the debtor's proposed sale procedures where finding the debtor has "exercised sound business judgment and presented sound business reasons for approval of the [b]id [p]rocedures."); *Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

26. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

27. Further, in the bankruptcy context, the business judgment rule applies to bidding incentives, such as break-up fee arrangements. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed by 3 F.3d 49 (2d Cir. 1993). The business judgment rule gives deference to the directors of a corporation and presumes that, in making a business decision, they "acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *See id*. Accordingly, a "bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *See id*. at 658.

28. The Debtor has sound business justifications for seeking approval of the Sale Procedures at this juncture. Based on the Debtor's financial circumstances (exacerbated by the COVID-19 pandemic and parts shortages) Debtor believes it is in the best interests of the estate and the creditors thereof to commence a sale process immediately. The Debtor's current liquidity position cannot support a lengthy stay in chapter 11, and the Debtor risks losing value as a going concern if a sale is not finalized soon. In the Debtor's business judgment, the best option for maximizing the value of the Assets is through a sale of the Assets pursuant to the proposed Sale Procedures.

29. The Debtor believes that the Sale Procedures will maximize the value of the Estate for the benefit of creditors. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the estate will receive the greatest possible consideration. Further, the Bid Protections proposed herein are intended to be agreed to by the Debtor only after good faith, arms'-length negotiations with the potential purchasers. Those placeholder protections proposed here are fair, reasonable, necessary, and in the best interests of the Debtor's estate to maximize the value of the Debtor's Assets.

30. As additional support, § 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Sale Procedures will greatly assist the Debtor in maximizing the value that may be obtained for all of the Assets. Consequently, the Debtor respectfully submits that granting the requested relief is necessary and appropriate under the circumstances.

**WHEREFORE,** the Debtor respectfully requests that the Bankruptcy Court (a) grant the Motion; (b) approve the Sale Procedures; (c) approve the Bid Protections; (d) approve all deadlines proposed herein; (e) approving all notices proposed herein; (f) approve the procedures governing assumption and assignment of the Assumed and Assigned Contracts, including the notice procedures set forth herein; and (g) grant the Debtor such other and further relief as is just and proper.

Respectfully submitted,

**MARTIN & DROUGHT, P.C.**
Weston Centre
112 East Pecan Street, Suite 1616
San Antonio, Texas 78205
Telephone: (210) 220-1334
Facsimile: (210) 227-7924
E-Mail: mcolvard@mdtlaw.com

By: /s/Michael G. Colvard
Michael G. Colvard
State Bar No. 04629200

**COUNSEL FOR DEBTOR DALTON CRANE, L.C.**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was forwarded via the Court's ECF System and via U.S. Mail, First Class, postage prepaid, to the parties listed on the attached service list on January 5, 2022.

/s/Michael G. Colvard
MICHAEL G. COLVARD