United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 29, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATED BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-33218** |
| DALTON CRANE, L.C., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

<u>**MEMORANDUM OPINION**</u>

On May 31, 2022, the Court held a hearing regarding the results of a turnkey sale proposed by Dalton Crane, L.C., and the procedures for a future auction sale. Prior to the hearing, several creditors objected to the auction procedures and the Court was further presented with two questions. First, whether an auction has already been authorized by this Court. Second, whether Broker/Auctioneers Tiger Capital Group, LLC and Great American Global Partners, Inc. may surcharge secured creditors' collateral pursuant to 11 U.S.C. § 506(c) with a buyer's premium in cash for secured creditors making credit bids. At the conclusion of the hearing, the court ordered briefing. All briefing has been submitted and the matter is ripe for determination. For the reasons stated herein, the Court finds that an auction was authorized, consummation of which is contingent upon auction procedures being approved by this Court, and that secured creditors' collateral may be surcharged, so long as the expenditure was necessary; the amounts expended were reasonable; and (3) a benefit to the secured creditor is demonstrated. The Court further finds that objections to the auction procedures are sustained in part and overruled in part.

**I.    BACKGROUND**

1. On October 1, 2021, Dalton Crane, L.C., ("*Debtor*") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division commencing this chapter 11 case.[1]

2. On January 5, 2022, Debtor filed its "Motion for Order (I) Approving Sale Procedures Relating to Sale of Substantially All of the Estate's Assets Free and Clear of Liens and Encumbrances; (II) Approving Procedure for Granting Bid Protections; (III) Scheduling Objection Deadlines and the Hearing to Approve the Sale; (IV) Approving the Form and Manner of Notices; (V) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; and (VI) Granting Related Relief" ("*Sale Motion*")[2] seeking approval of the marketing process for the sale substantially all of Debtor's assets ("*Assets*").

3. On January 5, 2022, Debtor filed its "Application of Debtor for Entry of an Order Authorizing the Employment and Retention of Tiger Capital Group, LLC, ("*Tiger Capital*") and Great American Global Partners, Inc. ("*Global Partners*," together "*Tiger/Global*") as Broker/Auctioneer"[3] ("*Application*") seeking approval of the retention of Tiger and Global Partners, pursuant to that Sale and Auction Agreement ("*Agreement*")[4] by and between Tiger/Global and the Debtor.

4. On January 27, 2022, the Court entered an order approving the Application ("*Retention Order*").[5]

5. Under the Agreement, Tiger/Global agreed to implement a bifurcated marketed and sales strategy for the Debtor's Assets.  During the first phase of this process, Tiger/Global agreed to market the Assets "as a turnkey offering" for a period of approximately sixty (60) days from entry of the Sales Procedures Order ("*Turnkey Sale*").[6]

6. If no turnkey buyer was successfully identified through the Turnkey Sale, the Agreement provided that Tiger/Global would then proceed to market and sell the Assets piecemeal through private sales and, ultimately, at a public auction sale ("*Auction Sale*").[7]

7. As compensation for a Turnkey Sale, the Agreement provided that:

    i.   Tiger/Global would receive (i) a commission-based fee of seven percent (7%) on a Turnkey Sale for less than $15,000,000 or five percent (5%) on a Turnkey Sale exceeding $15,000,000; plus (ii) reimbursement of expenses.[8]

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.,§) thereof refers to the corresponding section in 11 U.S.C.
[2] ECF No. 117.
[3] ECF No. 118.
[4] ECF No. 118, Ex.1.
[5] ECF No. 159.
[6] ECF No. 118, Ex. 1 at 7, ¶ 2.4.
[7] *See Id.*
[8] *See* ECF No. 118, Ex.1 at 8, ¶¶ 4.1, 4.1a

     ii.    as compensation for sales other than a Turnkey Sale, the Agreement provided that: (i) after reimbursement to Tiger/Global a guaranteed amount of $13,500,000 (the "*Guaranteed Amount*") to be paid to the Debtor's estate, Tiger/Global would receive the next $300,000 in proceeds and (ii) for any proceeds exceeding $13,800,000, Tiger/Global would receive ten percent (10%).[9]

     iii.    Tiger/Global would be entitled to charge and retain a fifteen percent (15%) buyer's premium to all purchasers at the Auction.[10]

     iv.    as to the Guaranteed Amount, the Agreement specifically provided that such amount was subject to adjustment and conditioned upon Tiger/Global's inspection of the Assets.[11]

8.    On February 16, 2022, the Court entered its order approving the Sale Motion ("*Sale Procedures Order*"),[12] which among other things, approved and established the two phase sale process set forth in the Agreement subject to certain modifications. Specifically, the Debtor was authorized to:

     i.    solicit bids for a Turnkey Sale of its Assets, provided, however, that any Turnkey Sale proposed to be consummated by the Debtor was required to have a purchase price exceeding $16,000,000.00 ("*Turnkey Minimum*");

     ii.    if no bids were received meeting the Turnkey Minimum within sixty (60) days of the entry of the Sale Procedures Order, the Debtor was to issue a Notice of Auction and seek approval of auction procedures.

9.    On May 6, 2022, Debtor filed its "Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co."[13] ("*Notice of Allocation*") in which the proposed Asset Purchase Agreement from Bigge Crane and Rigging Co. ("*Bigge*"), proposed to purchase all assets of Debtor for $13,550,000 subject to adjustment based on further inspection.

10.    On May 11, 2022, De Lage Landen Financial Services, Inc. filed its "De Lage Landen Financial Services, Inc.'s Objection to Sale Hearing and Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Doc. # 220]."[14]

11.    On May 11, 2022, Midland States Bank D/B/A Midland Equipment Finance filed its "Midland States Bank D/B/A Midland Equipment Finance's Objection to Sale Hearing and Notice

---

[9] *See* ECF No. 118, Ex. 1 at 8, ¶¶ 4.2, 4.2b.
[10] *See* ECF No. 118, Ex. 1 at 9, ¶ 4.2d.
[11] *See* ECF No. 118, Ex. 1 at 9, ¶ 4.2(e).
[12] ECF No. 191.
[13] ECF No. 220.
[14] ECF No. 225.

of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Doc. # 220]"[15]

12. On May 12, 2022, Ameris Bank filed its "Ameris Bank's Objection to Debtor's Proposed Turnkey Sale and Notice of Proposed Allocation."[16]

13. On May 12, 2022, Jackson County filed its "Response and Limited Objection of Jackson County to Debtor's Motion to Sell Assets Free And Clear of Liens and Encumbrances and Proposed Allocation Schedule/Waterfall of Sale Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co."[17]

14. On May 12, 2022, Signature Financial LLC filed its "Objection of Signature Financial LLC to Turnkey Sale of Assets Free and Clear of Liens and Encumbrances."[18]

15. On May 12, 2022, Simmons Bank filed its "Simmons Bank's Objection to Sale Hearing and Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Dkt. No. 220; Dkt. No. 220-1]."[19]

16. On May 12, 2022, Old Second National Bank filed its "Old Second National Bank's Objections to Dalton Crane's Proposed Turnkey Sale of Assets to Bigge Crane & Rigging Co., and to Dalton Crane's Related Proposed Allocation of Sales Proceeds."[20]

17. On May 12, 2022, People's Capital and Leasing Corp. filed its "People's Capital and Leasing Corp.'s Objection to Sale Hearing and Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Doc. #220]."[21]

18. On May 12, 2022, Mitsubishi HC Capital America Inc. filed its "Objection by Mitsubishi HC Capital America Inc. to the Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Assets by Dalton Crane, L.C. to Bigge Crane & Rigging Company."[22]

19. On May 13, 2022, First State Bank filed its "Objection of First State Bank to Debtor's Motion to Sell (Docket 191)."[23]

20. On May 13, 2022, m2 Lease Funds LLC N/K/A M2 Equipment Finance LLC filed its "m2 Lease Funds LLC N/K/A M2 Equipment Finance LLC's Objection to Sale Hearing and

---

[15] ECF No. 226.
[16] ECF No. 230.
[17] ECF No. 233.
[18] ECF No. 234.
[19] ECF No. 235.
[20] ECF No. 236.
[21] ECF No. 237.
[22] ECF No. 239.
[23] ECF No. 245.

Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Doc. #220]."[24]

21. On May 13, 2022, Debtor filed "Advice to the Court of: (I) Debtor's Receipt of Asset Purchase Agreement From Bigge Crane & Rigging Company; (II) Report of No Qualified Bids; and, (III) Auction Notice/Procedures" ("*Auction Notice*")[25]

22. On May 17, 2022, Debtor filed a "Supplemental Notice of Sale/Auction Procedures"[26] ("*Supplemental Notice*"). Attached to the Supplement Notice were the "Terms of Sale"[27] ("*Terms of Sale*"). Debtor also filed an "Order Approving Auction Procedures and Notice"[28] ("*Proposed Order*" and together with Auction Notice, Supplemental Notice, and Terms of Sale, "*Auction Procedures*").

23. On May 17, 2022, the Court held a hearing on the Sale Motion and continued the hearing on the Sale Motion to May 31, 2022. [29]

24. On May 24, 2022, several creditors asserting liens in certain of the Assets, including Jackson County,[30] Simmons Bank,[31] Signature Financial, LLC,[32] People's Capital and Leasing Corp.,[33] De Lage Landen Financial Services, Inc.,[34] Ameris Bank,[35] and Midland States Bank d/b/a Midland Equipment Finance[36] ("*Objecting Creditors*"), filed objections to the Sale Motion and/or the Supplemental Notice. Generally, the objections primarily raise concerns regarding the status of the Guaranteed Amount and object to imposition of a fee chargeable against or arising from any Objecting Lenders' purchase of an Asset by credit bid.

25. On May 27, 2022, Debtor filed its "Reply of Dalton Crane, L.C. to: (1) Ameris Bank's Objection to Debtor's Proposed Turnkey Sale and Notice of Proposed Allocation [Dkt. No. 230]; (2) M2 Lease Funds LLC N/K/A M2 Equipment Finance LLC's Objection to Sale Hearing and Notice of Proposed Allocation Schedule/Waterfall of Sales Proceeds from Turnkey Sale of Dalton Crane, L.C. Assets to Bigge Crane & Rigging Co. [Dkt. No. 247]; (3) Response and Limited Objection of Jackson County to Debtor's Proposed Auction Procedures/Sale of Assets Free and Clear of Liens and Encumbrances [Dkt. No. 264]; (4) Simmons Bank's Objection to (I) Debtor's Notice of Auction Sale/Procedures; (II) Supplemental Notice of Auction Procedures; and (III) Proposed Order Approving Auction Procedures and Notice [Dkt. No. 265]; (5) Objection of Signature Financial LLC to (I) Order Approving Auction Procedures and Notice and (II) Supplemental Notice of Auction Sale/Procedures

---

[24] ECF No. 247.
[25] ECF No. 246.
[26] ECF No. 252.
[27] ECF No. 252-1.
[28] ECF No. 253.
[29] Min. Entry May 17, 2022.
[30] ECF No. 264.
[31] ECF No. 265.
[32] ECF No. 266.
[33] ECF No. 267.
[34] ECF No. 268.
[35] ECF No. 269.
[36] ECF No. 270.

[Dkt No. 266]; (6) People's Capital and Leasing Corp's Limited Objection to Proposed Order Approving Auction Procedures and Notice [Dkt. No. 267]; (7) De Lage Landen Financial Services, Inc's Supplemental Limited Objection to Supplemental Auction Procedures [Dkt. No. 268]; and (8) Midland States Bank D/B/A Midland Equipment Finance's Limited Objection to Supplemental Auction Procedures [Dkt. No. 270] ("*Debtor's Response*").[37]

26. On May 27, 2022, Tiger filed its "Reply in Support of Motion for Order (I) Approving Sale Procedures Relating to Sale of Substantially all of the Estate's Assets Free and Clear of Liens and Encumbrances; (II) Approving Procedure for Granting Bid Protections; (III) Scheduling Objection Deadlines and the Hearing to Approve the Sale; (IV) Approving the Form and Manner of Notices; (V) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; and (VI) Granting Related Relief."[38]

27. On May 31, 2022, the Court held a hearing and ordered briefing.

28. On June 14, 2022, Signature Financial, LLC,[39] Tiger/Global,[40] Simmons Bank,[41] Old Second National Bank,[42] Debtor,[43] People's Leasing and Capital Corp.,[44] and Midland States Bank d/b/a Midland Equipment Finance[45] timely filed their briefs.

29. All briefing has now been submitted and the matter is ripe for determination.

# I.   JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

## A.  Jurisdiction and venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11 or arising in or related to cases under title 11."  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[46] This Court determines that pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) this proceeding involves

---

[37] ECF No. 275.
[38] ECF No. 276.
[39] ECF No. 300.
[40] ECF No. 301.
[41] ECF No. 302.
[42] ECF No. 303.
[43] ECF No. 305.
[44] ECF No. 306.
[45] ECF No. 309.
[46] 28 U.S.C. § 157(a); *see also In re Order of Reference to Bankruptcy Judges*, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

primarily core matters as it "concern[s] the administration of the estate and other proceedings affecting the liquidation of estate assets."[47]

Furthermore, this Court may only hear a case in which venue is proper.[48]  Pursuant to 28 U.S.C. § 1409(a), "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  Debtor's main chapter 11 case is presently pending in this Court and therefore, venue of this proceeding is proper.

### B.  Constitutional authority to enter a final order

The pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[49]  The ruling in *Stern* was limited to the one specific type of core proceeding involved in that dispute, which is not implicated here.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.

Alternatively, this Court has constitutional authority to enter a final order because all parties in interest have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.[50]  The parties have engaged in extended motion practice before this Court.  No party has

---

[47] 11 U.S.C. § 157(b)(2); s*ee also In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

[48] 28 U.S.C. § 1408.

[49] *See, e.g., Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); see also *Tanguy v. West (In re Davis)*, No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' We decline to extend *Stern*'s limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503).

[50] *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 655 (2015) ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").

objected to this Court's constitutional authority to enter a final order or judgment.  These circumstances unquestionably constitute implied consent.  Thus, this Court wields the constitutional authority to enter a final order here.

## III.    ANALYSIS

### A.  Whether an auction has already been authorized by this Court

#### 1.  This Court's Sale Procedures Order

The parties here dispute whether this Court's Sale Procedures Order authorized an Auction Sale in the event the Turnkey Sale did not dispose of all Debtor's Assets.  Tiger/Global, along with Debtor, assert that the Sale Procedures Order already authorized the Auction Sale whereas creditors assert that the Auction Sale was not yet authorized.  This Court retains jurisdiction with respect to all matters relating to the interpretation or implementation of the Sale Procedures Order and now interprets that Order.[51]

The Sale Procedures Order authorizes an Auction Sale, but commencement of the Auction Sale is contingent upon approval by this Court of the notice of and procedures for the Auction Sale.  The Sale Procedures Order explicitly states that:

> [I]f the Turnkey Sale does not dispose of all equipment assets, the Sale Hearing shall be conducted as a Status Hearing to advise the Court of the results of the Turnkey Sale and *request approval of the Notice and procedures for an Auction Sale*.[52]
> . . . .
>
> [I]n the event Debtor received no qualified offer in excess of the $16,000,000.00 minimum Turnkey Sale price, the Sale Hearing shall be conducted as a Status Hearing to advise the Court of the results of the Turnkey Sale process and *to approve the Notice and procedures for the Auction Sale*, containing time and location of the Auction Sale and rules, and procedures setting requirements to participate in the Auction process, to all secured creditors asserting liens on Dalton's assets to be sold at auction, and providing that any party objecting to the Auction Sale procedures

---

[51] ECF No. 191 at 13, ¶ 33.
[52] *Id.* at 3, ¶ F (emphasis added).

> may file an objection within five (5) days prior to the Auction Sale and requesting
> a hearing thereon to be held prior to the Auction Sale . . . .[53]

Given the plain language of the Sale Procedures Order, the Auction Sale is contingent upon reso-

lution of objections to the Auction Sale procedures and approval of such procedures by this Court.

Furthermore, at the February 9, 2022 hearing on the Motion, the parties thereto agreed to bi-

furcate the sale process such that only the Turnkey Sale procedures were at issue.

> Mr. Colvard:  If we don't have a turnkey sale, we'll proceed with an auction. Before
> we proceed with the auction, we'll issue notice of the auction. The notice of the
> auction will include procedures for participation. We didn't think that – including
> now at this point in time, it would be economically prudent because we feel that the
> turnkey is more likely.[54]

> But in the event we proceed with an auction sale, there will be procedures set forth
> within the notice. There'll be a timeline for the creditors to object to the proceeding
> prior to the auction occurring and an opportunity for hearing, so any concern with
> respect to their rights to participate in an auction sale will be clarified within that
> process.[55]

> All we're doing today is asking for the Court to approve the procedures, and the
> procedures now are simply this: we're going to have a 60-day sale window to pro-
> cure a turnkey buyer. If we procure a turnkey buyer within 60 days, we're going to
> have a sale hearing and we're going to ask the Court to set a sale hearing today in
> order to keep everybody's toes to the fire.[56]

In discussing Debtor's proposed Sale Order, Mr. Colvard stated:

> But in essence, all it does is, number one, it sets a sale hearing; number two, it gives
> them an opportunity to object; number three, it says that in the event that we don't
> procure a turnkey buyer for an amount in excess of $15 million, that we're going to
> have a notice of an auction process and within that notice of auction process, the
> rules and procedures for participation will be attached. If a creditor has an objection,
> then they can file their objection within the deadline and they can request a hearing;
> if not, we'll go forward with the auction process at that point and the secured cred-
> itor can participate and exercise their 363(k) rights at that point.[57]

---

[53] *Id.* at 4, ¶ 3 (emphasis added).
[54] ECF No. 232-17 at 15:6–12.
[55] *Id.* at 15:13–19.
[56] *Id.* at 23:13–19.
[57] *Id.* at 24:16–25:2.

The Court: All right. Does everybody understand what we're doing here. Miss Arotsky.

Ms. Arotsky [counsel for Signature]: Yes. Your Honor, I just want to clarify while we're still on the record. Do I understand that the intention is, at this time, not to approve procedures for the auction sale, which would be the auction conducted by Tiger if there's no approval -- or if there's no turnkey bid? Am I correct that we're only discussing right now bid procedures for the turnkey sale?

Mr. Colvard [counsel for Debtor]: Yes, that's correct.  To the extent we will advise and provide notice of the auction sale.  And within the auction sale, notice procedures will be set forth, along with an opportunity to file objections and to request a hearing.

Ms. Arotksy:  Thank you for that clarification.  I appreciate it.[58]

As evidenced by the excerpts above, at the February 9, 2022 hearing all parties operated under the shared understanding that only the procedures for the Turnkey Sale were in consideration and that procedures of the tentative Auction Sale would be considered at a later date and secured creditors would have the opportunity to object to such procedures.

Accordingly, although this Court authorized an Auction Sale, the occurrence of such Sale is contingent upon two conditions precedent: (1) a failure to dispose of all assets by Turnkey Sale and (2) approval by this Court of the Auction Sale procedures.  Only the first condition has been satisfied.

## 2.  This Court's Retention Order

This Court's Retention Order authorized Debtor to employ Tiger/Global as Broker/Auctioneer.[59]  Debtor and Tiger/Global assert that the Retention Order also authorized the Auction Sale to proceed.[60]  The Agreement, incorporated into the Retention Order, outlines Tiger/Global's rights and responsibilities, to include their compensation structure.[61]  Of particular import are

---

[58] ECF No. 232-17 at 29:23–30:13.
[59] ECF No. 159 at 1.
[60] ECF No. 301 at 5; ECF No. 305 at 4, ¶ 2.1
[61] ECF Nos. 159, 118-1.

Tiger/Global's responsibility to "proceed with a Phase 2 piecemeal offering of the Assets through private sales and an online public auction sale, if necessary . . . ."[62] and Tiger/Global's right to consultant's fees in the event of a successful Turnkey Sale or a successful Auction Sale.[63]

However, the terms of the Agreement themselves contemplated further orders of this Court prior to commencement of the Auction Sale.  The Agreement defines "Approval Order" as "one or more orders of the Bankruptcy Court . . . authorizing the Company to . . . (c) enter into and consummate the transactions set forth herein (including the sale (or sales) of the Assets) without further order of the Bankruptcy Court . . . ."[64]  The Agreement provides that:

> With respect to the Phase 1 Turnkey Sale, Consultant shall immediately market the Assets as a turnkey offering, and continue to do so for a period of approximately sixty (60) days from the entry of the Approval Order. In the event Consultant has not successfully procured a buyer for the Assets on a turnkey basis during this time, Consultant shall proceed with a Phase 2 piecemeal offering of the Assets through private sales and an online public auction sale, if necessary, which shall be scheduled within approximately ninety (90) days after the end of the Turnkey Sale period.[65]
>
> . . . .
>
> Subject to the entry of the Approval Order, Company has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and has taken all steps necessary and has good and valid authority to consummate the transactions contemplated hereby, including the conduct of the Sale[.][66]

By the terms of the Agreement, subject to entry of the Approval Order, Tiger/Global would have authority to consummate the Auction Sale.  While the Sale Procedure Order, as discussed above, authorized Tiger/Global and Debtor to proceed with the Turnkey Sale, no such order was entered regarding the Auction Sale.  In fact, the Sale Procedure Order explicitly required additional authorization before commencement and consummation of the Auction Sale.

---

[62] ECF No. 118-1 at 7, ¶ 2.4.
[63] *Id.* at 4–5, ¶¶ 4.1–4.3.
[64] *Id.* at 5, ¶ 1.1.
[65] *Id.* at 7, ¶ 2.4.
[66] *Id.* at 10, ¶ 6.1(a).

Accordingly, the Court finds that the Retention Agreement did not authorize an Auction Sale to proceed absent approval by this Court of auction procedures.

Debtor and Tiger/Global further argue that Tiger/Global's employment was authorized by this Court pursuant to §§ 327(a) and 328(a) permitting retention on a percentage or contingent fee basis subject to adjustment only if such terms have been improvident and in light of developments not capable of anticipation at the time when such terms were fixed.[67]  According to Debtor and Tiger/Global, no unforeseen events have been established because both the Agreement and the Sale Procedures Order authorized the Auction Sale.[68]  Debtor and Tiger/Global are correct that an Auction Sale was authorized, however—and again—contingent upon approval by this Court of auction procedures.  Dalton together with Tiger/Global agreed to alter the 15% buyer's premium to 7%, provided however, that if equipment is acquired through secured creditor credit bid, the commission is further reduced to 3%.[69]  Tiger/Global's employment and compensation has not been altered by this Court in any way.  Tiger/Global's compensation as set forth in the Agreement and as voluntarily altered by Dalton together with Tiger/Global is subject to the consummation of an Auction Sale, which is contingent upon approval of auction procedures by this Court.

Accordingly, the Court finds that the Agreement has not been altered by this Court.

**B. Whether Tiger/Global are entitled to a cash commission by secured creditors making credit bids pursuant to 11 U.S.C. § 506(c)**

Based on creditor response to the proposed Bigge Notice of Allocation, Debtor together with Tiger/Global considered strategies for proceeding with an auction process, designed to: (i) minimize costs associated with sale and commissions; (ii) provide processes for secured creditors'

---

[67] ECF No. 301 at 5–6 (citing 11 U.S.C. § 328(a); *In re Barron*, 225 F.3d 583, 585 (5th Cir. 2000)); ECF No. 305 at 6–7, ¶ 2.4 (citing 11 U.S.C. § 328(a); *ASARCO, LLC v. Barclays Capital, Inc. (In re ASARCO, LLC)*, 702 F.3d 250 (5th Cir. 2012)).
[68] ECF No. 301 at 6; ECF No. 305 at 6–7, ¶ 2.4.
[69] ECF No. 253 at 3; ECF No. 275 at 6, ¶ 14(iii).

participation; (iii) allowing creditors to exercise credit bid rights under 11 U.S.C. § 363(k).[70]  In

furtherance of those objectives, Debtor together with Tiger/Global agreed to waive the guaranty

of the minimum gross sales proceeds and alter the buyer premium of 15% to a 7% commission,

provided however, that if equipment is acquired through secured creditor credit bid, the commis-

sion is further reduced to 3%.[71]  Nevertheless, creditors have raised objection to payment of 3%

commission in the event of a credit bid.

Administrative expenses are generally satisfied out of the bankruptcy estate.[72]  A limited

exception to that rule is found in § 506(c), which states:

> The trustee may recover from property securing an allowed secured claim the rea-
> sonable, necessary costs and expenses of preserving, or disposing of, such property
> to the extent of any benefit to the holder of such claim, including the payment of
> all ad valorem property taxes with respect to the property.

To charge a secured creditor with administrative expenses under § 506, three elements must be

shown: (1) the expenditure was necessary; (2) the amounts expended were reasonable; and (3) the

creditor benefited from the expenses.[73]  Payment of administrative expenses from the proceeds of

secured collateral are allowed when incurred primarily for the benefit of the secured creditor or

when the secured creditor caused or consented to the expense.[74]  A party seeking to surcharge a

secured creditor's collateral for an expense bears the burden of proving that the expense was in-

curred "primarily for the benefit of the secured creditor and that the expenses resulted in a quanti-

fiable direct benefit to the secured creditor."[75]

---

[70] ECF No. 305 at 3–4, ¶ 1.5.
[71] ECF No. 253 at 3; ECF No. 275 at 6, ¶ 14(iii).
[72] *Borrego Springs Bank, LLC v. Skuna River Lumber, L.L.C. (In re Skuna River Lumber, LLC)*, 564 F.3d 353, 355 (5th Cir. 2009) (citing *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991)).
[73] *In the Matter of Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir.1991) (citing *In re Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982)).
[74] *In re Hughes*, 2006 WL 1308677, at *2 (S.D. Fla. 2006).
[75] *In re Delta Towers*, 924 F.2d 74, 77 (5th Cir. 1991).

The crux of Objecting Creditors' contention is that they should be exempt from expenses since they intend to "credit bid" at the Auction Sale.  Credit bidding, permitted by § 363(k), is a term of art, which permits a creditor to bid at a sale under § 363(b) in an amount up to its entire claim.[76]  Section 363(k) further provides that "if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."

Nothing in § 506(c) or the Fifth Circuit prevents a court from permitting a surcharge against the collateral of a successful credit bidder, so long as the expenditure was necessary, the amount expended was reasonable, and the secured creditor benefitted from the expense.[77]  For example, in *Borrego Springs*, the bankruptcy court and the district court held that the creditor may be charged with the financial advisor's fees and expenses in conducting an auction because the creditor benefitted from the advisor's action in generating interest in the property and establishing its value for the sale.[78]  The Fifth Circuit reversed on jurisdictional grounds, finding that the property was no longer part of the bankruptcy estate at the time the bankruptcy court tried to surcharge the collateral because the surcharge was added after the sale, which was made free and clear of liens.[79]  However, the Fifth Circuit explicitly stated that "[i]f the bankruptcy court wished to retain jurisdiction over the property, it should have withheld approval of the sale pending [the secured creditor's] payment of [the financial advisor's] fees (or perhaps provided that any property acquired by credit bid would be conveyed subject to lien securing applicable [financial advisor] auction fees)."[80]  Thus, although the Fifth Circuit reversed on jurisdictional grounds, it's decision suggests that a surcharge may be

---

[76] COLLIER ON BANKRUPTCY ¶ 363.09 (Richard Levin & Henry J. Sommer eds., 16th ed. 2022).
[77] *See In the Matter of Delta Towers, Ltd.*, 924 F.2d at 76.
[78] *Borrego Springs Bank, N.A. v. Skuna River Lumber, LLC*, 381 B.R. 211 (N.D. Miss. 2008).
[79] *In re Skuna River Lumber, LLC*, 564 F.3d at 356.
[80] *Id.*

permitted, so long as such is assessed while the bankruptcy court still has jurisdiction over the collateral.

Other courts have permitted surcharges on credit bids as well.  In *In re NJ Affordable Homes Corporation*, the bankruptcy court authorized a 10% buyer's premium on all successful credit bids pursuant to a retention order which provided that "[a]s compensation for services performed by the [Joint Venture] hereunder, the [Joint Venture] shall be entitled to a commission on the sale of every Property equal to ten percent (10%) of the highest bid for such Property (the 'Buyer's Premium')."[81]  The court noted that the record demonstrated that the cost of performing a global liquidation of the collateral would be less than the cost of each creditor initiating their own sales, thus providing a benefit to the creditors.[82]  Here, the Agreement is similar to the retention order in *In re NJ Affordable Homes Corporation* in that it contemplates charging a buyer's premium to the highest bidder, without distinguishing between successful credit bids and successful cash bids.[83]  As in *In re NJ Affordable Homes Corporation* Tiger/Global must still demonstrate that the Auction Sale benefits the secured creditors.

In *In re A-1 Plank & Scaffold Manufacturing*, the court found that a surcharge on a credit bid was permitted where the employed realtor aided in the disposition of collateral.[84]  Citing other courts for their reasoning, the court noted that a credit bid is simply another method of payment that is an alternative to cash, that the sale process can establish a market value for assets which confers a benefit to the creditor, and that without the ability to surcharge a credit bit, professionals

---

[81] 2006 Bankr. LEXIS 4498, at *60 (Bankr. D.N.J. June 29, 2006).
[82] *Id.* at *60–61.
[83] ECF No. 118-1 at 9, ¶ 4.2(d).
[84] 437 B.R. 689, 695 (Bankr. D. Kan. June 7, 2010).

would be discouraged from providing services to debtors or trustees if their fees could be circumvented by credit bidding.[85]

People's Capital argues that by permitting a surcharge on credit bids, it would be effectively deprived of the indubitable equivalent of its claim and its collateral would be further undervalued.[86]  The "indubitable equivalent" concern arises from § 1129(b)(2)(A).  For a plan to be deemed "fair and equitable" with respect to a nonconsenting creditor's claim, it must meet one of three requirements under § 1129(b)(2)(A).[87]  The plan must provide that: (i) the secured creditor retains a lien on the property and receives deferred cash payments; (ii) the property is sold free and clear of the lien, subject to § 363(k), and the creditor receives a lien on the proceeds of the sale; or (iii) the creditor receives the "indubitable equivalent" of its claim.[88]

In *RadLAX*, the Supreme Court stated that:

> [Clause] (i) is the rule for plans under which the creditor's lien remains on the property, [clause] (ii) is the rule for plans under which the property is sold free and clear of the creditor's lien, and [clause] (iii) is a residual provision covering dispositions under all other plans--for example, one under which the creditor receives the property itself, the "indubitable equivalent" of its secured claim.[89]

The Supreme Court held that "[d]ebtors seeking to sell their property free of liens under § 1129(b)(2)(A) must satisfy the requirements of clause (ii), not the requirements of *both* clauses (ii) and (iii)."[90]  To satisfy § 1129(b)(2)(A)(ii), lienholders must be permitted to credit bid.[91]  Here, Debtor contemplates sale of the Assets under § 363 and permits secured creditors to credit bid at

---

[85] *Id.* (first citing *In re HNRC Dissolution Company*, 340 B.R. 818, 821 (E.D. Ky. 2006), then citing *In re Skuna River Lumber LLC)*, 381 B.R. 211, 231, *rev'd on other grounds*, F.3d 353 (5th Cir. 2009)).
[86] ECF No. 306 at 5–6, ¶¶ 8–9.
[87] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 643 (2012).
[88] *Id.*
[89] *Id.* at 647.
[90] *Id.* at 647–48.
[91] *Id.* at 647.

an Auction Sale, which satisfies § 1129(b)(2)(A)(ii) according to *RadLAX*. Thus, contrary to People's Capital's argument, the "indubitable equivalent" of clause (iii) does not come into play.

Old Second argues that because the Supreme Court in *RadLAX* stated that credit bidding "enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan[,]"[92] a surcharge cannot be assessed.[93] The "additional cash" that a successful credit bidder would pay to Tiger/Global for the surcharge is not to protect the loan, it's to compensate Tiger/Global for the costs of the sale pursuant to § 506(c) and will be paid only if Tiger/Global can demonstrate that the secured creditor benefitted from the expenses of the sale.

Given the authority cited above, this Court finds that a surcharge on a credit bid is permitted, so long as the expenditure was necessary, the amount expended was reasonable, and the secured creditor benefitted from the expense.[94] Because the question posed by this Court was whether Tiger/Global may surcharge secured creditors' collateral with a buyer's premium in cash for successful credit bids,[95] the Court does not decide whether Tiger/Global have demonstrated that their expenditures was necessary, the amount expended was reasonable, or that the secured creditors benefitted from the expense. Today, the Court merely decides whether a surcharge on a credit bid is prohibited by § 506(c) or controlling case law.

Accordingly, the Court finds that a surcharge on a credit bid is not prohibited by § 506(c) or controlling case law.

### C. Objections to the Auction Procedures

#### 1. Common objections asserted by multiple Objecting Creditors

---

[92] *Id.* at 644 n.2.
[93] ECF No. 303 at 2, ¶ 2.
[94] *In the Matter of Delta Towers, Ltd.,* 924 F.2d at 76.
[95] See May 31, 2022 Min. Entry.

Multiple Objecting Creditor's object to the Auction Procedures on the basis that: (i) § 363(f) is not satisfied; (ii) there is no guaranteed minimum sales price; (iii) Tiger/Global intends to charge successful credit bids a 3% buyer's premium; (iv) there is no procedure for determining a secured creditor's allowed claim amount for purposes of credit bidding; (v) the auction instructions will not be shared until ten days before the Auction Sale; (vi) no set minimum bids or bidding increments; (vii) secured creditors are required to register and pay an initial deposit to participate in the Auction Sale; and (viii) the determination and allocation of ad valorem taxes.  The Court addresses each in turn.

### i.  Section 363(f)

Simmons Bank and Midland object to the Auction Sale on the basis that § 363(f) has not been and cannot be satisfied, particularly without a minimum guaranteed sales price.[96]  Simmons Bank asserts that it does not consent to the sale of its collateral fee and clear of its interest and thus, § 363(f) is not satisfied.  Midland likewise withholds consent and argues that Debtor has not established that it is entitled to sell Midland's collateral free and clear under any other subsection of 363(f).

Section 363(f) provides that property may be sold under §§ 363(b) or (c) only if:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

---

[96] ECF No. 265, 270.

As required by the Proposed Order, "[s]ubject to entry of a final order approving such sales, all sales shall be made free and clear of all claims, liens and encumbrances . . . ."[97]  For this Court to enter an order approving any sale free and clear of liens and encumbrances, Debtor must demonstrate that § 363(f) has been satisfied.  If Debtor cannot make such a showing, then the sale cannot be made free and clear of liens and encumbrances.  However, Debtor need not make that showing before the Auction Sale can proceed.  The objection is premature.

Accordingly, the objection is overruled.

### ii.  Minimum guaranteed sales price

Simmons Bank, Signature Financial, People's Capital, Ameris Bank, and Midland object to the Auction Procedures on the basis that no minimum guaranteed amount of sales proceeds is established.[98]  Tiger/Global's Response indicates that it still intends to set forth a guaranteed minimum amount of sales proceeds based on the remaining Assets to be auctioned (less those encompassed by the Agreed Order Conditioning Stay with De Lage as discussed further below) and the condition of the Assets upon inspection.[99]

Accordingly, the objection to the minimum guaranteed sales price is sustained and the Auction Procedures must set forth such information.

### iii.  3% buyer's premium on credit bids

Simmons Bank, Signature Financial, People's Capital, Ameris, and Midland object to the imposition of a buyer's premium on successful credit bids.[100]  As found above, Tiger/Global are entitled to charge a buyer's premium on credit bids so long as they can demonstrate the expenditure was necessary, the amount expended was reasonable, and the secured creditor benefitted from the

---

[97] ECF No. 253 at 4.
[98] ECF Nos. 265, 266, 267, 269, 270.
[99] ECF No. 276 at 6–7, ¶¶ 15–17.
[100] ECF Nos. 265, 266, 267, 269, 270.

expense.  Moreover, the 3% surcharge is not per se unreasonable if Tiger/Global can demonstrate those three elements.[101]  However, the Court notes that because a credit bid has the same effect as a cash bid,[102] charging a 7% buyer's premium on cash bids and 3% on credit bids is not justified.[103]  The buyer's premium should be consistent for all successful bids, whether cash or credit or at a minimum demonstrate to the Court a reasonable basis for such disparate treatment between cash buyers and credit bidders.

Accordingly, the objection as to the buyer's premium is overruled, but the Auction Procedures must propose a consistent buyer's premium or demonstrate to the Court a reasonable basis for such disparate treatment between cash buyers and credit bidders.

### iv.  Lack of procedure for determining amount of allowed claim

Simmons Bank and Midland object to the Auction Procedures on the basis that there is no procedure defined for determining the amount of an allowed claim for purposes of credit bidding.[104]  Midland also objects on the basis that the Auction Procedures do not adequately address the timing or method of resolving any disputes or objections related to a secured creditor's proposed credit bid amount.[105]  The Auction Notice provides that "[a]ll secured creditors . . . shall only be entitled to utilize credit bid rights up to the amount of their allowed secured claim to purchase the collateral, subject to such secured creditor liens and encumbrances."[106]

A claim is deemed allowed unless a party in interest objects.[107]  Federal Rule of Bankruptcy Procedure 3001(f) provides that "[a] proof of claim executed and filed in accordance with these

---

[101] *See In re NJ Affordable Homes Corp.*, 2006 Bankr. LEXIS 4498, at *60 (permitting a 10% buyer's premium).
[102] *Spillman Dev. Group, Ltd. v. Am. Bank of Tex. (In re Spillman Dev. Group, Ltd.)*, 2010 Bankr. LEXIS 3893, at *13 (Bankr. W.D. Tex. Oct. 29, 2010) (citing *In re HNRC Dissolution Co.*, 340 B.R. at 824–25).
[103] ECF No. 253 at 3, ¶ 3.
[104] ECF Nos. 265, 270.
[105] ECF No. 270 at 2, ¶ 3.
[106] ECF No. 246-1 at 2.
[107] 11 U.S.C. § 502(a).

rules shall constitute prima facie evidence of the validity and amount of the claim."  No objection has been made to Simmons Bank's Claim No. 23-1 in the amount of $1,099,453.37.  No objection has been made to Midland's Claim No. 12-1 with a secured amount of $50,000, Claim No. 13-1 with a secured amount of $75,817.22, or Claim No. 14-1 with a secured amount of $112,136.77. Debtor's Response also contemplates that secured creditors will bid the amount of their secured claims.[108]

However, Debtor's schedules list both Simmons Bank and Midland's claims as contingent, unliquidated, and disputed,[109] and Debtor's proposed Plan of Reorganization provides that "any objections to Claims shall be filed on or before the date that is the later of: (a) 60 days after the Effective Date, and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims."[110]  Therefore, the amount each secured creditor will be permitted to credit bid has not been clearly established.

Accordingly, Simmons Bank and Midland's objection to the procedures for determining the amount of allowed claims is sustained.  Procedures for determining allowed claims and resolving objections to a proposed credit bid must be established.

### v.  Auction instructions

Signature Financial and Midland object to the release of the auction instructions ten days prior to the Auction Sale, asserting that the information should be included in the Auction Procedures, giving secured creditors the opportunity to review and comment on those instructions.[111] Particularly because the instructions include important auction procedures such "[r]ules regulating

---

[108] ECF No. 275 at 7 ("Secured creditors previous rejection of the $13.55 APA from Bigge, evidence creditor preference for a sum greater than the $13.1 Tiger/Global guarantee, which is assured within the auction process by secured creditor credit bid up to the amount of the secured debt which could total an amount in excess of the $13.1 million Tiger/Global guarantee if all secured creditors bid the amount of their secured claim.").
[109] ECF No. 2.
[110] ECF No. 157.
[111] ECF No. 266 at 8–9, ¶ 22; ECF No. 270 at 3, ¶ 5.

the auction process - process for bidding, bidding increments, back-up bids, proxy bidding, and determination for final bids,"[112] the Court agrees that such should be included in the Auction Procedures for review by the secured creditors and pursuant to the Sale Procedures Order, which provides secured creditors an opportunity to object to procedures for the Auction Sale.[113]

Accordingly, Signature Financial and Midland's objection to release of certain information ten days before the Auction Sale is sustained.

### vi.  Minimum bid and bidding increments

Simmons Bank and Signature Financial object to the Auction Procedures on the basis that no minimum bid is set for each item of collateral.  Simmons Bank further objects that minimum bidding increments are not set.[114]  The Supplemental Notice provides that Tiger/Global will provide instructions to auction participants no later than ten days prior to the scheduled auction date, which will include "[r]ules regulating the auction process - process for bidding, bidding increments, back-up bids, proxy bidding, and determination of final bids[.]"[115]  In the best interest of the estate and its creditors, those rules should also include procedures for calculating the minimum bid for a particular item of collateral.[116]

Accordingly, the objection to the bidding increments and procedures for setting a minimum bid is sustained.

### vii. Registration and initial deposit

---

[112] ECF No. 252 at 2.
[113] ECF No. 191 at 4, ¶ 3.
[114] ECF No. 265 at 6, ¶ 18.
[115] ECF No. 252 at 2.
[116] *See Econ. Stone Midstream Fuel, LLC v. M/V A.M. Thompson*, 2009 U.S. Dist. LESIX 2253, at *5 (N.D. Miss. Jan. 13, 2009) (finding that setting the minimum bid at $2 million was within the best interest of the parties); *20th Century Fox Film Corp. v. M.V. Ship Agencies*, 992 F. Supp. 1434, 1438 (M.D. Fla. 1997) (setting the minimum bid at a high enough price to protect both plaintiff and defendant's interest in having vessel sold at a high enough price to cover all potential claims and expenses).

Simmons Bank objects to the requirement that secured creditors register to be eligible to participate in the Auction Sale and pay an initial deposit.[117]  Ameris also objects to the payment of an initial deposit.[118]  The Terms of Sale provides that all persons participating in the Auction Sale must register and pay a deposit.[119]  Neither Simmons Bank nor Ameris has provided justification for giving secured creditors special treatment by not requiring them to register or pay an initial deposit.  Additionally, the Terms of Sale provide that the initial deposit is refundable upon request if no purchase is made.[120]

Accordingly, Simmons Bank and Ameris's objection to registering and paying a deposit is overruled.

### viii.   Determination and allocation of taxes

Jackson County holds a secured tax claim for the 2021 tax year and a post-petition tax lien for 2022 ad valorem taxes against the property subject the Sale Motion.[121]  Jackson County objects to the Auction Procedures on the basis that (i) although paragraph 3 of the Terms of Sale deals with "Taxes," ad valorem taxes are not adequately addressed because there is no proposed procedure for how and when outstanding taxes will be calculated;[122] and (ii) there is no provision that provides that successful credit bidders either take the property subject to Jackson County's liens or provides that the lienholder must immediately satisfy the liens of Jackson County whose collateral is affected by the credit bid.[123]  In line with Jackson County, Midland objects to paying any

---

[117] ECF No. 265 at 6, ¶ 20.
[118] ECF No. 269 at 1, ¶ 3.
[119] ECF No. 252-1 at 1.
[120] *Id.*
[121] ECF No. 264 at 1.
[122] *Id.* at 2.
[123] *Id.*

portion of its sales proceeds to cover unpaid taxes absent a procedure that fairly amortizes or pro-rates the payments of such taxes among all secured creditors in a fair and equitable manner.[124]

Paragraph 3 of the Terms of Sale states that "[w]hen required by law, Agent shall collect and Buyer shall pay all sales/use taxes or other applicable taxes which will be added to the purchase price, including the Buyers [sic] premium, on all purchased Items."[125]  There is no provision in the Auction Procedures detailing when taxes will be calculated, how they will be allocated against each encumbered asset, or how they will be collected in the event of a successful credit bid, injecting uncertainty in to the auction process.

Accordingly, Jackson County and Midland's objections are sustained.

### 2. Jackson County's individual objection

Jackson County argues that proceeds from the auction in an amount sufficient to cover the taxes owed to Jackson County must be deposited into a segregated account pursuant to § 363(c)(4) because Jackson County objects to the use of its cash collateral for any purpose.[126]  Section 363(c)(4) requires that cash collateral be segregated and accounted for where an entity that has an interest in such cash collateral does not consent to its use or the court has not authorized use of the cash collateral.  Here, Jackson County does not consent to the use of its cash collateral for any purpose and asserts that "[i]f the intention is that all auction sale proceeds are to be paid over to the estate and will [sic] disbursed in accordance with the proposed Plan of Reorganization," then sufficient proceeds to cover Jackson County's tax lien should be held in a segregated account.[127]

Jackson County's objection is premature.  First, the confirmation hearing on the Plan of Reorganization has not yet been held and thus, Debtor could not distribute funds according to the

---

[124] ECF No. 270 at 2–3, ¶ 4.
[125] ECF No. 252-1 at 2.
[126] *Id.* at 3.
[127] ECF No. 264 at 3.

Plan of Reorganization at this time.  Second, Debtor is compelled by § 363(c)(4) to segregate and account for cash collateral in its possession absent any order of this Court, unless Debtor seeks Jackson County's consent to use cash collateral or seeks permission from this Court.[128]  Therefore, in the event Debtor seeks permission from this Court to use cash collateral in which Jackson County has an interest, Jackson County may object at that time.

Accordingly, Jackson County's objection is overruled.

### 3.  Simmons Bank's individual objections

Simmons Bank objects to the return of collateral it repossessed pre-petition to Debtor's yard for a virtual auction as provided in the Proposed Order.[129]  The Proposed Order requires that "Debtor shall return all equipment to be sold at the auction to its yard no later than May 27, 2022,"[130] it does not require Simmons Bank to return any collateral nor is there a turnover order in place.

Accordingly, because the Auction Procedures do not require Simmons Bank to return the collateral it repossessed to Debtor's yard, the objection is overruled.

Simmons Bank also objects to the auctioneer's right to "add to, group, withdraw, re-catalog Items in all Sales . . ." arguing that Debtor has implied that its equipment will be sold on a piece-by-piece basis and that there is no mechanism for allocation of the sales price to individual items of collateral if grouped.[131]  The Proposed Order states that "Debtor has provided a proposed Notice of Auction/Procedures, . . . providing that the auction will offer equipment individually in separate lots, to allow secured creditors to credit bid on their specific collateral . . . ."[132]  Thus, the Proposed

---

[128] 11 U.S.C. § 363(c)(2).
[129] ECF No. 265 at 5, ¶ 17.
[130] ECF No. 253 at 3.
[131] ECF No. 265 at 6, ¶ 22.
[132] ECF No. 253 at 3.

Order conflicts with the Terms of Sale.  Tiger/Global must rectify the inconsistency and if intending to group items, provide a mechanism for allocating the sales price.

Accordingly, Simmons Bank's objection to the grouping of collateral without a mechanism for allocating the sales price is sustained.

### 4.  Signature Financial's individual objections

Signature Financial objects to the portion of the Proposed Order that states, "the Debtor and Tiger/Global have agreed that Tiger/Global's compensation for services provided to the estate shall be calculated as a commission percentage of auction proceeds (the 'Commission') plus reimbursement of expenses" because the Auction Procedures are silent as to what funds will be used to pay expenses.[133]  Signature Financial further asserts that it should be made clear that any expenses sought to be recovered are incurred in connection with the Auction Sale, and not the Turnkey Sale.

The commission contemplated in the Proposed Order is the buyer's premium Tiger/Global seek to charge pursuant to § 506(c).  Amounts recovered pursuant to § 506(c) are for costs and expenses of preserving or disposing of property.  Therefore, the expenses are covered by the buyer's premium Tiger/Global is permitted to charge, pursuant to the conditions discussed above.  Tiger/Global is not entitled to additional compensation or payment of expenses beyond any buyer's premium Tiger/Global demonstrates itself entitled to recover.  Second, pursuant to the Agreement incorporated by the Retention Order, Tiger/Global is not entitled to compensation for an unsuccessful Turnkey Sale in the event of an Auction Sale.[134]

Accordingly, Signature Financial's objection to Tiger/Global's reimbursement of expenses is overruled.

---

[133] ECF No. 266 at 8, ¶ 19.
[134] ECF No. 118-1 at 6–7, ¶¶ 16–17.

Signature Financial next objects to the Auction Procedures, arguing that to its knowledge, there has not been any marketing of individual assets and that the Auction Procedures must address how individual assets will be advertised and marketed.[135]  To ensure the Auction Sale is in the best interest of the estate and its creditors, the Auction Procedures must contain marketing procedures as well.

Accordingly, the objection is sustained.

Lastly, Signature Financial objects to the Proposed Order on the basis that it does not specify which of the Terms of Sale will apply to the Auction Sale.[136]  As an example, Signature Financial points out that the Terms of Sale includes a buyer's premium, but that the Proposed Oder does not mention a buyer's premium.[137]  The Terms of Sale are incorporated by and attached to the Proposed Order.[138]

Accordingly, the objection is overruled.

### 5. De Lage Landen Financial Services, Inc's individual objection

De Lage objects to the Auction Procedures on the basis that it does not carve out certain equipment subject to an Agreed Order Conditioning Stay entered into by Debtor and De Lage.[139] In the Agreed Order Conditioning Stay, Debtor stipulated that De Lage had an ownership interest in two boom dollies and two cranes and that Debtor would not sell, sub-lease, or transfer the equipment to third parties.[140]  In Tiger/Global's Response, it explicitly notes that Debtor does not have

---

[135] ECF No. 266 at 8, ¶ 21.
[136] ECF No. 266 at 9, ¶ 23.
[137] *Id.*
[138] ECF No. 253.
[139] ECF No. 268 at 2, ¶ 3 (citing ECF No. 170).
[140] ECF No. 170 at 2, ¶¶ 2–3.

authority to sell all of the Assets because of the Agreed Order Conditioning Stay.[141]  The Auction

Procedures must be clarified to ensure compliance with the Agreed Order Conditioning Stay.[142]

       Accordingly, De Lage's objection is sustained.

### 6.  Midland's individual objection

       Midland objects to the Auction Procedures on the basis that the Supplemental Notice is

vague and ambiguous in terms of how sales proceeds will be allocated once a particular piece of

equipment is sold and the allocation of proceeds amongst lienholders in the event more than one

lienholder asserts an interest in the equipment sold.[143]  Pursuant to the Proposed Order, Debtor

must seek a final order approving the sale of the Assets from this Court.[144]  As part of that process,

Debtor must detail how sales proceeds will be allocated amongst the various lienholders.  The

allocations need not be included in the Auction Procedures.

       Accordingly, the objection is overruled.

### IV.      CONCLUSION

       An order consistent with this Memorandum Opinion will be entered on the docket simul-

taneously herewith.


       SIGNED June 29, 2022

                                      Eduardo Rodriguez
                           United States Bankruptcy Judge

---

[141] ECF No. 276 at 6, ¶ 15.
[142] ECF No. 170.
[143] ECF No. 270 at 2, ¶ 4.
[144] ECF No. 253 at 4, ¶ 5.